# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## WARREN *et al.* v. BRANCH *et al.*

Decided April 26, 1879.

(Absent, MOORE, JUDGE.)

1879
Special Term.

1. J. sold to C. seven and one-fourth acres of land, and was paid therefor; afterwards he sold to him about fifty acres more adjoining, at $40.00 per acre. J. agreed to 'make to C. a deed for the whole of said land upon·his executing to him a bond for $2,000.00, payable in five years with R., H. and W., as his securities, nothing being said about the vendor's lien; and the vendor relied exclusively on the bond and on the personal security. The deed was to be executed as soon as the land sold was surveyed; and if on the survey it turned out to be less than fifty acres, the difference was to be credited on · some cattle J. had previously sold to C. The bond was drawn for $2,000.00; and on its face stated the consideration to be for land purchased. The securities R., H. and W., who signed this bond, made no enquiries of the vendor J. When surveyed, the land turned out to be forty-six acres, and the price of it $1,840.00. The difference, $160.00, was credited on the purchase of the cattle. The deed was made as soon as the survey was completed, and did not reserve the vendor's lien. It was recorded shortly afterwards. The principal died insolvent some three years afterwards, having paid only $500.00 on this bond. When it was executed he was a man of large property, and in good credit. After this bond was executed, these sureties signed with others his bond as sheriff, and one of them endorsed notes for him as first endorser, amounting to more than $2,000.00. HELD:

   This bond was binding on the securities to its full amount.

2. When with the knowledge and assent of the creditor there is a misrepresentation with regard to material facts, and had the real facts been known and not misstated, they might reasonably have prevented the security from entering into his contract of suretyship, such contract will not be binding on the surety, though such misrepresentation was not made with a fraudulent purpose.

3. Unless enquired of by a surety, a creditor is under no obligation to disclose facts in no manner connected with the business which is the subject of the suretyship, though such facts would probably have a decided influence on the surety in determining whether he would enter into the contract.

4. If a material fact connected with the contract of suretyship, which might influence the surety in entering into the contract, is *fraudulently* concealed with a view to benefit the creditor, such concealment, though no enquiry is made by the surety, would discharge him.

5. But though the simple failure of a creditor to communicate to a surety a fact material for the surety to know, and though this fact be connected with the contract of suretyship, will not generally vitiate the contract, unless the concealment by the creditor was fraudulent, even though the principal in procuring the security to enter into the contract acted fraudulently; yet if the dealings are such as fairly to lead the creditor, if a reasonable man, to believe that the principal *must* have used fraud by suppressing facts or otherwise, in procuring the surety to enter into the contract, and such fraud has been used, it will vitiate the contract as to the surety, though no actual fraud be traced to the creditor.

6. If a contract is made for the sale of land, and nothing be said in the contract about the vendor's lien being reserved, and bond and personal security be taken for the purchase-money, this alone will not amount to a waiver of the vendor's lien; but if it be shown by direct evidence, or by the circumstances of the case, that the vendor relied only on the bond and personal security, the vendor's lien is waived, and he would be required to execute a deed without reserving the vendor's lien. Before the passage of our statute requiring an express reservation of this lien on the face of the deed, the execution of a deed and the taking of personal security would amount to a waiver of the vendor's lien.

Appeal from and *supersedeas* to a final decree of the circuit court of Monroe county, rendered on the 17th day of October, 1877, in a chancery cause in said court then pending, wherein S. J. Warren and others were plaintiffs, and Thomas Branch and others were defendants, granted on the petition of said Warren.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case:

In May, 1877, John M. Rowan and S. J. Warren filed their bill in the circuit court of Monroe county, in which they allege that on October 27, 1871, James W. Johnson sold to one Samuel A. Clark, deceased, fifty-three acres of land in that county for $2,000.00, payable five years after the sale, with interest from the day of sale, payable annually. That on the day of the sale Clarke applied to the plaintiff and one J. A. J. Hull, deceased, to execute with him and as his securities a bond to said Johnson for this purchase-money. And he stated to them that Johnson was to retain the title to the land till the purchase-money was paid. The bond, which he presented to them and asked them to sign with him as his securities, on its face stated it was given for the purchase of a tract of land. That four months afterwards Johnson executed to Clarke a deed for this land without retaining on the face of the deed a vendor's lien; and that Clarke had died insolvent. That on the day the bond was given, Johnson assigned it to Thomas Branch, who had brought suit in court for said bond, which was subject to credits endorsed on it amounting to $879.74. That Clarke died in July, 1875; and that the plaintiffs did not know that Johnson had conveyed this land to Clarke till after his death. They pray an injunction to the further prosecution of this suit, and that the sureties in this bond be forever discharged from all liability arising from their having executed this bond; and for general relief. Johnson, Branch and the administrators of Clarke and Hull were made defendants. The injunction asked was awarded, but was not perfected till a judgment had been rendered in the common law suit.

Johnson filed his answer which states that before the date of this bond he had sold Clarke seven and one-fourth acres of land, for which he had paid; and on the day the bond was given he sold him adjoining this seven and one-fourth acres forty-six acres more at $40.00 per acre,

which amounted to $1,840.00 ; and he proposed that if he, Johnson, would convey him the two parcels of land, he would give the plaintiffs and Hull as his securities. Nothing was said about the vendor's lien being retained ; and the security offered was satisfactory without the vendor's lien. He therefore accepted the proposition and agreed to make the deed as soon as the land could be surveyed ; and the deed was accordingly made without the vendor's lien being retained, he, Johnson, having no idea that the securities in this bond relied on the vendor's lien being retained. And during Clarke's lifetime they never mentioned that they supposed such lien had been retained, or had been agreed to be retained. The balance to make up the $2,000.00 was a debt that Clarke owed him for cattle.

Branch filed his answer stating that the bond was assigned to him for value on the day it bears date.

The plaintiffs filed an amended bill in October, 1877, in which they state that Johnson pretends that this bond was given in part for land, and in part for cattle, for which Clarke owed him, and that when Clarke purchased the land, it was agreed between Clarke and Johnson that a bond should be executed to Johnson for $2,000.00 with the plaintiffs and Hull as his securities, and it was further agreed between them, that if upon a measurement of the land, sold at $40.00 per acre, it did not amount to $2,000.00, then said Johnson was to give Clarke credit for the difference upon the debt due from Clarke to him for cattle. This agreement the plaintiffs allege was a fraud upon them, and destroyed the validity of this bond as to the securities in it.

The answers of Johnson and Branch to this amended bill refer to Johnson's statements in his deposition as their answer. He states in his deposition, that he had sold to Clarke seven and one-fourth acres of land and made him a deed for it, which he did not have recorded ; in the fall of 1871, he sold him a piece of land adjoining this, and Clarke proposed to him, if he would

give him a new deed including both pieces of land he would give the plaintiffs and Hull as security for the purchase-money, which was $40.00 per acre payable in five years with interest from date of sale. The quantity of land included in the boundary of the land as sold was not known ; and it was agreed he should give the bond for $2,000.00, that is for fifty acres, and if it should turn out less on its being surveyed, the difference would be credited on a debt Clarke owed him for cattle. The survey was not made for several months ; and as soon as made the deed was executed without reserving the vendor's lien, nothing having been said during the negotiation or afterwards about the vendor's lien. The securities in the bond never mentioned the vendor's lien to him, or said anything to him about the transaction till after Clarke's death in 1875. The bond on its face stated its consideration to be land. Clarke up to his death was in good credit and had a large amount of property. Johnson says he had neither information nor impression that the securities in the bond relied on his retaining a vendor's lien on the land.

The securities prove that Clarke, when he asked them to sign the bond as his securities, said that it was for a piece of land he wanted very much, and that the land would stand for the purchase-money and was good for it, if he failed. From what he said they believed the title would be retained till the purchase-money was all paid ; and they do not believe they would have signed the bond, if they had not so believed. They never spoke to the vendor, Johnson, on the subject ; and did not know the deed was made till after Clarke's death. It was recorded more than three years before Clarke's death. It was also proved that the securities in this bond and eight other persons signed, as securities for Clarke, his bond as sheriff of Monroe county, in the fall of 1872, the penalty of the bond being $70,000.00, and also that Warren, one of the securities, was the first endorser in the Bank of Union for Clarke, on several notes amounting to $2,160.20.

1879
Special Term.

Warren *et al.*
*v.*
Branch *et al.*

Had the vendor's lien been reserved the land would, if sold, have brought more than sufficient to pay the balance due upon the purchase-money bond.

On October 17, 1877, the cause was heard on the bill, and amended bill, answers and general replications thereto, and the depositions ; and the Court, being of opinion that for the $160.00 paid the defendant, Johnson, and credited decedent, Samuel A. Clarke, on a debt due from him to said Johnson, the plaintiffs are entitled to relief in this Court, but are not entitled to any other relief. The injunction was therefore dissolved, except as to this $160.00, which was directed to be credited on said judgment as of October 27, 1871, as to which the injunction was perpetuated, but without prejudice to Johnson in asserting his claim for this $160.00 against Samuel A. Clarke's estate in any manner he might think proper. No costs were decreed either party. From this decree Warren has obtained an appeal and *supersedeas* ; and the appellees assign the crediting of this $160.00 as an error against them which they ask may be corrected.

*James F. Patton* and *A. N. Campbell*, for appellants, cited the following authorities :

1 Rand. 53; 10 W. Va. 662 ; 11 W. Va. 307 ; 37 Me. 542 ; 12 Cl. & Fin. 109 ; 3 DeG. & J. 593 ; DeColyer, Guar. & Sure. 368, 369, 370 ; 4 H. L. Cas. 1034, 1035 ; 3 B. & C. 605 ; 6 Hill (N. Y.) 56 ; 5 Bing. N. C. 142 ; 6 Scott 846 ; 2 T. R. 763 ; 4 Bev. 379 ; 2 Kay. & J. 174 ; 18 Gratt. 812 ; 6 W. Va. 122 ; Story Eq. Jur. §325.

*John W. Harris* and *Samuel Price*, for appellees.

GREEN, PRESIDENT, delivered the opinion of the Court :

The question presented by the record in this case is : What misrepresentations or failures to disclose facts and circumstances by a creditor will release a security from

his obligation to pay a debt? When with the knowledge and assent of the creditor, there is a misrepresentation with regard to a material fact, which, had it been known, might reasonably have prevented the security from entering into his contract of suretyship, such contract will not be binding on the surety, though such misrepresentation was not made with a fraudulent purpose. As for instance, if a loan of £2,600 be made with the understanding that an old debt of £900 is to be paid out of it, and security is given for the £2,600 under the false impression on the mind of the security that this £900 has already been paid, produced by reading a mortgage to him in which it is recited that this old debt of £900 had been paid, the contract of the security will thereby be rendered invalid. The fact that the £900 had not been paid as stated, but was to be paid out of the loan, might, if known, have reasonably prevented the security from signing the note; and this misstatement renders the contract void as to him. See *Stone* v. *Compton*, 5 Bing. N. C. 142, 35 E. C. L. 57.

So in *Willis* v. *Willis*, 17 Sim. 218, Arthur Willis in consideration of a conveyance to his principal of certain property free from all except certain specified incumbrances became his surety. It turned out that the property was subject to another incumbrance not specified, which the grantor had at the time forgotten; and this incumbrance was unknown to the surety. This misrepresentation it was held rendered the contract invalid as to the security.

In *Cooper* v. *Joel*, 1 DeG., F. & J. 240, (62 Eng. Ch. R. 240,) a surety gave a written guarantee for the payment of several judgments, the creditors consenting, as they supposed that they had a right to do, to postpone the sale of the debtor's property. They had no right to give such consent without the concurrence of a third party; and the sale was made. It was held that the surety was not bound by this guarantee.

Sometimes the law has been laid down much stronger.

Thus in *Rawlton* v. *Matthews*, 10 Cl. & Fin. 934, Hicks, who had been the agent of the firm of Matthews & Leonard, upon the dissolution of the firm was again appointed their agent on giving his brother and E. Rawlton as security for the faithful performance of his duty. He having misapproparited funds which came into his hands, his surety, E. Rawlton, asked to have his suretyship held void, alleging that Matthews & Leonard had fraudulently suppressed the fact that, when formerly their agent, he had been guilty of gross irregularities and owed a balance to them on this former agency and was untrustworthy to their knowledge. An issue was directed to be tried, "whether E. Rawlton was induced to subscribe the bond by undue concealment or deception on the part of Matthews & Leonard." The judge on the trial charged the jury: "That under this issue the concealment must be first of things known to Matthews & Leonard, or which they had strong and grave grounds to suspect; secondly, that the concealment being undue must be wilful and intentional, with a view to the advantage they were thereby to receive." Upon appeal the House of Lords held this charge to be erroneous. In delivering his opinion Lord Campbell says: "If the defendants had facts within their knowledge, which it was material the surety should be acquainted with, and which the defendants did not disclose, in my opinion the concealment of those facts, the undue concealment of those facts, discharges the security; and whether they concealed those facts from one motive or another I apprehend is wholly immaterial." And again: "The liability of a surety must depend upon the situation in which he is placed, upon the knowledge which is communicated to him of the facts of the case, and not upon what was passing in the mind of the other party, or the motive of the other party." Lord Cottenham however bases his opinion in this case on much narrower grounds. He says: "It has not been contended, and it is impossible to contend after what Lord Eldon lays down in the case of *Smith* v.

*The Bank of Scotland,* 1 Dow 272, 292 *et seq.*; S. C. 7 Shaw 244, 248, that a case may not exist in which a mere non-communication would invalidate a bond of surety-ship." And again: "The learned judge in this case lays it down distinctly, that the concealment, to be undue, must be wilful and intentional with a view to the advantage they were thereby to receive. In my opinion there may be a case of improper concealment or non-communication of facts which ought to be communicated, which would affect the situation of parties, even if it were not wilful and intentional and with a view to the advantage the parties were to receive."

1879
Special Term.
Warren *et al.*
v.
Branch *et al.*

The previous authorities, it seems to me, do not sustain the broad position of Lord Campbell. It is true that in the case of *Pidcock* v. *Bishop,* 3 B. & C. 605 (10 E. C. L. 197), it was decided, that when "it was agreed between the vendors and vendees of goods that the latter should pay ten shillings per ton beyond the market-price, which sum was to be applied in liquidation of an old debt due one of the vendors, and the payment of the goods was guaranteed by a third person, but the bargain between the parties was not communicated to the surety, that this was a fraud on the surety, and rendered the guarantee void." In this case, though the vendee had some time before this purchase become a bankrupt, and the ten shillings per ton was to be applied to the payment of an old debt due one of the vendors before his bankruptcy, this conduct of the vendors amounted, as the opinions of the judges show, to a *fraud* on the security. The controlling motive of one of the vendors was to secure the payment of a debt which he could not otherwise collect; and if the facts had been made known to the security it was highly probable he would have declined to give the guarantee. His object in going the security was to aid his friend in procuring goods to engage in business anew, and not to pay his old debts, from the payment of which he had been discharged as a bankrupt.

In *Middleton* v. *Lord Onslow*, 1 P. Wms., most of the creditors of a party signed a deed of composition, agreeing to take seven shillings and six pence on the pound on their debts and discharge the debtor, the deed providing that it should be void unless executed by all the creditors. Some of them took bonds secretly for the payment of the balance of their debts at a future day. The court ordered these bonds to be surrendered, the court holding that the underhand dealings of these creditors was a fraud. This action of the court was evidently based on the ground that there was in these dealings a fraudulent purpose on the part of these creditors.

Other cases might be referred to ; but there is, I think, no case which sustains the position taken by Lord Campbell in *Rawlton* v. *Matthews*, 10 Cl. & Fin. 934, that the intent of the creditor in not communicating the facts to the surety is in all cases wholly immaterial. The cases do establish, it is true, that the creditor must, in dealing with the surety, adhere to entire good faith ; but they by no means sustain the extreme position of Lord Campbell. His position was subsequently shaken by the decision in *Hamilton* v. *Watson*, 12 Cl. & Fin. 108, where it was held that an obligation to a banker by a third party, to be responsible for a cash credit to be given to one of the banker's customers, is not avoided by the fact, that immediately after the execution of the obligation the cash credit is employed to pay off an old debt due to the banker. Though the case was decided specially on the ground that no fraud was averred, and the circumstances were not so stated in the pleadings as to raise the inevitable inference of fraud or deception, nor was there an allegation that the payment of the old debt was in accordance with a previous agreement. Lord Campbell himself said in this case "no bankers would rest satisfied that they had security for the advance made, if, as is contended, it is essentially necessary that every thing should be disclosed by the creditor that is material for the surety to know. If such was the rule, it would be in

dispensably necessary for the bankers, to whom the security is to be given, to state how the account has been kept; whether the debtor was in the habit of overdrawing; whether he was punctual in his dealings; whether he performed his promises in an honorable manner—for all these things are extremely material for the surety to know. But unless questions be particularly put by the security to gain this information, I hold that it is quite unnecessary for the creditor, to whom the suretyship is to be given, to make any such disclosure. * * * * If there be nothing which might not naturally take place between the parties, then if the surety would guard against particular perils, he must put the question, and he must gain the information he requires."

1879
Special Term
———
Warren *et al.*
v.
Branch *et al.*

In the case of *The North British Insurance Co.* v. *Lloyd*, 10 Exch. Rep. 522, it was decided "that the rule which prevails in insurance on ships and lives, that all material circumstances known to the assured must be discovered, though there be no fraud in the concealment, does not extend to the case of a guarantee. In the latter case the concealment, to vitiate the guarantee, must be *fraudulent*." This decision is directly opposed to the views of Lord Campbell in *Rawlton* v. *Matthews*, 10 Cl. &Fin. 934. And even the views of Lord Cottenham in that case do not seem to be sustained. In *The North British Insurance Co.* v. *Lloyd*, 10 Exch. Rep. 522, the brother of the debtor withdrew his guarantee, and the debtor then procured another guarantor without there being disclosed to him the fact, that the debtor's brother had withdrawn his guarantee. The court says: "The non-disclosure of the change of security, even if it had been material, would not have vitiated the guarantee, unless it had been fraudulently kept back; and there is no ground to impute fraud in fact to the plaintiffs or their agents." The court say that *Smith* v. *The Bank of Scotland*, 1 Dow 272, was decided on the ground that the representation to the surety of the trustworthiness of the principal, known or believed by the bank to be untrue, was fraud. The case of

*Rawlton* v. *Matthews*, 10 Cl. & Fin., they criticise and consider as based on the position, that, in order to render a concealment by a person fraudulent, it is not necessary that it should be made with a view to the advantage that person would thereby receive; and they disapprove of Lord Truro's statement in *Owen* v. *Homan*, 3 Man. & G. 378, that he thinks the principles which govern assurances are applicable to sureties.

The Lord Chancellor when the case of *Owen* v. *Homan* was brought before the House of Lords, thus states the law: (See 4 H. L. Rep. Cas. 1035) " Without saying that in every case a creditor is bound to enquire under what circumstances his debtor has obtained the concurrence of a security, it may safely be stated, that if the dealings are such as fairly to lead a reasonable man to believe that *fraud must have been used* in order to obtain such concurrence, he is bound to make enquiry, and can not shelter himself under the plea that he was not called upon to ask, and did not ask, any question on the subject. In some cases wilful ignorance is not to be distinguished in its equitable consequences from knowledge. If a person abstains from enquiry because he suspects the result of enquiry will probably be to show that a transaction, in which he is engaging, is tainted with fraud, his want of knowledge of the fraud will afford no excuse."

The American decisions generally are certainly not more stringent than the English cases in requiring a full disclosure of all facts by the creditor in order to hold the security of a debtor responsible. Thus in *Graves et al.* v. *Tucker*, 10 Smed & Mar. (Miss.) Ch., it was held, that if a principal, in procuring one to become his surety, commits a fraud upon the security, either in suppressing or misstating facts, and the creditor has no knowledge of and gives no assent to the fraud, the surety will be liable to the creditor; and in *Richmond* v. *Standclift*, 14 Vt. 258, and in *Samuels* v. *Withers*, 16 Mo. 532, it was held, in the first case, that a private arrangement between the

1879
Special Term.
——————
Warren *et al.*
v.
Branch *et al.*

creditor and debtor, not disclosed to the surety, that usurious interest should be paid on the money, would not render invalid the surety-contract; and in the second case, that the actual including in the note such usurious interest would not, though unknown to the surety, render the contract as to him invalid.

In the case of *Franklin Bank* v. *Cooper*, 36 Me. 180, it was held, that to accept a surety known to be acting under the belief that there was no unusual circumstance by which the risk will be materially increased, while the party thus accepting knows that there are such circumstances, and withholds the knowledge of them from the surety, though having a suitable opportunity to communicate them, is a legal fraud, which discharges the surety. As where the bond of a cashier was framed to cover past as well as future delinquencies, it will be invalid against a security, if his name was procured at the desire of the directors, they knowing that past delinquencies existed of which he was ignorant, and withholding the knowledge from him, though with a suitable opportunity to communicate it. Shipley, C. J., delivering the opinion of the court, in speaking of the case of *Stone* v. *Compton*, 5 Bing. N. C. 142, where a portion of the money borrowed was applied to an old debt, says that the surety was in that case released, because a deed was made to him which recited that this old debt was paid, and not simply because it was to be paid out of the money borrowed, for this would not have been unusual in the ordinary course of business, and would not of itself have released the security.

In the case of *Atlas Bank* v. *Brownell et al.*, 9 R. I. 168, it was decided, that the sureties of a cashier, to avoid their liability on his bond, must show that on the part of the directors there was a *fraudulent concealment* of something material for the surety to know. In that case the cashier had shortly before giving the bond lost money by gambling, which the directors knew, and in consequence thereof they increased his bond and required ad-

ditional security. The directors did not communicate these facts to the person who signed the bond as such additional security. The surety was nevertheless held bound. The court says: " We think it is going too far to say that the creditor is in all cases, and without being enquired of, bound to communicate everything that it is important for the surety to know and that would increase his risk. Under such a rule no one would ever know when he could rely on a bond; and it would lead to a great deal of litigation. We think the safe rule is, that, to avoid the bond, there must be on the part of the creditor a fraudulent concealment, or withholding of something material for the surety to know." And again : " If there had been an actual default, and an attempt by the directors to cover it up or reimburse themselves at the expense of the surety, the case would be different. Moreover, the cases which have been referred to are cases in which the information withheld, or not disclosed, related in some way to the business which was the subject of the surety-ship. It did not follow because he gambled he would fail in his duty as cashier."

In the case of *Etting* v. *The Bank, of the U. S.,* 11 Wheat. 59, the distinction between material facts, which are not connected with the business which was the subject of the suretyship, being suppressed, and important facts not disclosed, but which did directly relate to the business which was the subject of the suretyship, was discussed by the able counsel in argument. And it was urged, there was a great difference between the conceal-ment of *intrinsic* circumstances and the concealment of *exrinsic* circumstances. But the court being equally divided expressed no opinion on this question in that case.

We concur with Potter, J., in his statement in the case of *Atlas Bank* v. *Brownell et al.,* 9 R. I. 174, that Judge Story in his Equity Jurisprudence states the doctrine with reference to the cases, in which concealment of facts by a creditor will vitiate the contract of a surety of a debtor,

much more strongly than the decided cases will warrant. We cannot draw from these decisions the conclusion he draws, that in the case of a surety concealment of facts, which go to increase his risk, amounts to a fraud on the surety : and the omission to disclose such is equivalent to an affirmation that the facts do not exist. See Story's Eq. J., §§214, 215, 324 and 383.

1879
Special Term.

Warren *et al.*
v.
Branch *et al.*

Our conclusion is, that unless enquired of by the surety a creditor is under no obligation to disclose facts in no manner connected with the business which is the subject of the suretyship, though such facts would probably have a decided influence on the surety in entering into, or declining to enter into, his contract of suretyship. As, for example, in the taking of a bond of a cashier, the fact that he gambled largely might, and probably would, influence a surety in going on his bond, yet such fact not being in any manner connected with the contract that he would faithfully perform his duties as cashier, the directors are under no obligation to volunteer a disclosure of this fact to a surety. So too the insolvency of the principal need not, though known to the creditor, be disclosed to the surety, when no enquiry is made by him. If a material fact connected with the contract of suretyship, which might influence the surety in entering into the contract, is fraudulently concealed with a view to benefit the creditor, such concealment, though no enquiry has been made by the surety, would vitiate the contract of suretyship and discharge the surety. As for instance, the surety which is entered into is for money borrowed by the principal, and there is an agreement between the principal and the surety that the whole or a large part of the money so borrowed is to be applied to an old debt due the creditor, and this agreement is designedly concealed from the surety by the creditor, under the belief that he would not sign the bond as security if this was disclosed to him, such concealment, induced by such motives, would be a fraud on the surety and would vitiate his contract. But if the surety made

Syllabus 3.

Syllabus 4.

1879
Special Term.

Warren *et al.*
v.
Branch *et al.*

no enquiry on the subject, and the failure to disclose the fact, that the money borrowed or a portion of it was to be applied to the payment of an old debt due the creditor, was not induced by the belief on the part of the creditor that if disclosed he would not sign the bond as surety, then such failure to communicate this fact, not being fraudulent, does not vitiate the contract, and the surety would be held bound.

Syllabus 5.      But though the simple failure of a creditor to communicate to a surety a fact material for the surety to know though connected with the contract of suretyship, will not generally vitiate the contract, unless the concealment on the part of the creditor was fraudulent, even though the principal in procuring the security acted fraudulently, either in suppressing such material fact, or in misstating facts, yet if the dealings are such as fairly to lead the creditor, if a reasonable man, to believe that the principal *must* have used fraud in procuring the surety to enter into the contract, the creditor is bound to enquire of the surety, how his signing the contract has been procured ; and his failure to do so will, if fraud has been practiced by the principal on the surety, vitiate the contract as to him, though no fraud has been traced to the creditor. If he has abstained from enquiry in such a case, because he sees the result of the enquiry would probably be to show that the transaction, in which he was engaging, was tainted with fraud, his want of knowledge of the fraud would in such case afford no excuse.

Thus if the security signs the bond of a cashier, which binds him for past as well as future delinquencies, it would be a fraud on the surety for the cashier to suppress the fact that he was already delinquent; and as the directors in such a case must know that a surety would not in all probability sign such a bond, if informed that the cashier was already a defaulter, they would be bound to enquire of the surety, whether his signing the bond had been fairly procured after a disclosure of the past de-

linquency of the cashier; and if they failed to make such

enquiry, or disclose such fact, the obligation of the surety would be discharged by such failure, though the directors had no knowledge of how the principal procured the surety to sign the bond. So if a security sign a bond for money borrowed by a principal, who has just taken the benefit of the bankrupt law, wherewith the bankrupt is to begin business again, and a considerable portion of the money so borrowed is by a secret agreement between the lender and the bankrupt to be applied to an old debt due the creditor, from the payment of which the bankrupt had been discharged, the lender is bound in such case to enquire of the surety, whether he had been informed of this agreement so to apply a portion of the money loaned, because he must know that it is highly improbable that the principal disclosed this fact to the surety, as in fairness he was bound to do; and that in all probability the surety signed the note, believing that the money loaned was to be used in starting the bankrupt in business, and not in paying old debts he was not bound to pay. And the failure of the creditor to make this enquiry, or to disclose this fact of how the money was to be used, would vitiate the contract of suretyship, if the principal had procured the signature of the surety by misrepresentation, or by the fraudulent suppression of this fact.

If a creditor has ample security for a debt by a specific lien on land, and without the knowledge or consent of the surety discharges the lien, he thereby of course releases the surety. See *Ward* v. *Vass*, 7 Leigh 138. This it is insisted was done in this case, when, on the 28th day of February, 1872, Johnson made a deed of the land, for the purchase-money of which the bond sought to be enforced was given, without reserving the vendor's lien. Whether this discharged a lien he was entitled to hold depends upon whether under his contract with Clarke he had a right to reserve a vendor's lien. Before the passage of our statute abolishing the vendor's lien when it was not expressly reserved in the deed, if a vendor took

a bond with personal security and executed a deed for the land he could not claim a vendor's lien on the land. *Wilson et al.* v. *Graham's ex'r and devisees,* 5 Munf. 297. But if he had not made a deed, the vendor does not lose his vendor's lien on the land simply because he has taken personal security for the purchase money; and in such a case the surety would have a right to go into a court of equity to subject the land to the payment of the debt; the retention of the legal title in such a case being satisfactory evidence that the vendor did not intend to rely solely on the personal obligation of the debtor, or on that of his security, to pay the purchase-money. See *Hatcher's adm'r* v. *Hatcher's ex'r,* 1 Rand. 53; *Dunlap's adm'r* v. *Shanklin, ex'r, et al.,* 10 W. Va. 662.

Whether the taking of personal security for the purchase-money is, or is not, a waiver of the vendor's lien depends upon the intention of the parties in giving and receiving such personal security. If the credit was given *exclusively* to the purchaser and his personal security, the inference is, that by the understanding of the parties the vendor's lien was not to be reserved, though the contract for the sale be silent upon the subject of the vendor's lien; and this inference is much strengthened, if the deed is to be made at once, though the purchase-money by the contract is not to be paid for years; though the mere taking of personal security will not, as we have seen, without more, be sufficient evidence of this intention of the vendor to give credit exclusively to the purchaser or his surety. The right to retain the vendor's lien depends on the question whether the vendor gave exclusive credit to the purchaser and his sureties. If he did, he has no right to retain the vendor's lien; if he did not, he would have such right. See *Clarke* v. *Boyle,* 3 Sumn. 499; *Parrott* v. *Sweetland,* 3 Myl. & K. 655; *Buckland* v. *Pochnell,* 13 Sim. 406. And, if having it, he afterwards made the deed without retaining the lien, sureties for the purchase-money would be thereby discharged.

In the case before us it appears that by the contract

between the vendor, Johnson, and the vendee, Clarke, a deed was to be made for the land, as soon as it could be surveyed; and the purchase-money was not to be paid for five years, but good personal security was to be given for the purchase-money. The deed was also to include in it a parcel of land, which had been bought by the vendee of the vendor before and fully paid for by him. The circumstance, that this parcel of land was to be included in the deed, would of itself indicate that the parties did not understand that the vendor's lien was to be retained, but that the land then bought was to be conveyed in the same way as that which had been previously bought and fully paid for. Under these circumstances it seems to me the inference must be drawn, that the sale was *exclusively* on the credit of Clarke and his sureties, and who they were to be was accordingly stipulated for, when the land was sold. Johnson testifies that by their contract he was expected to look only to this bond as the security for the payment of the purchase-money of the land; and there is not in the case anything which can lead us to any other conclusion. If this be so, he had no right in making the deed to retain the vendor's lien ; and had he done so, Clarke, we may believe, would not have received it, but could have compelled a conveyance without a reservation of the vendor's lien. The sureties were therefore not released by Johnson's execution of this deed.

It is insisted, however, that it was the duty of Johnson to inform the securities, though it was not enquired of by them, that by the contract between him and Clarke, the vendor's lien was not to be reserved; and that his failure to give them voluntarily this information of itself avoids their contract. By the law, as we have stated it, this failure on his part, although we might consider that the sureties might, or even probably would, have been influenced by this fact in deciding whether they would enter into the suretyship, yet the simple failure on the part of Johnson, when not asked, to seek the sureties

and give them this information would not vitiate the contract, unless Johnson in failing to communicate this information was influenced by a fraudulent motive with a view to his own benefit. There is nothing to give rise to the suspicion that he was so influenced and acted on such motives. Clarke, the vendee, owned a large amount of property and was in good credit. Johnson had no reason to suppose that the sureties suggested by Clarke would decline to execute the bond, if they were informed that the vendor's lien was not to be reserved. They went Clarke's sureties afterwards in a bond much more likely to throw responsibilities on them, his sheriff's bond; and one of them became his first endorser on notes in bank exceeding the amount of this bond for the purchase-money of land ; thus clearly indicating their belief that they did not incur risk, of which they were afraid, in signing this bond. Johnston had, therefore, no reason to believe that a statement to them, that the vendor's lien was not to be reserved, would have prevented them from signing the bond. Much less could he as a reasonable man, under the circumstances, believe that Clarke *must* have used fraud in procuring them to sign this bond as his sureties. There was nothing on the face of the bond which would naturally induce them to believe that the vendor's lien was to be reserved, or that a deed was not to be made till the purchase-money was all paid. It is true the bond showed that it was given for the purchase of land, but it was not payable for five years; and this made it improbable that the title was to be retained till all the purchase-money was paid. And as it was signed by these securities, this made it probable, they being ample security, that the vendor's lien was not to be retained. The law draws no decided inference, as we have seen, the one way or the other, whether a vendor's lien is to be retained, from the fact that a bond with personal security is taken for the purchase-money. While this alone will not justify the conclusion that the vendor's lien is not to be retained, yet this conclusion may not

only be disproven, but may be, and often is, rebutted by the mere circumstances of the particular case.

Under the circumstances of this case, as presented to the securities, they would not have been justified without enquiring of Johnson in acting on the belief that the vendor's lien was to be retained. They say that from what Clarke said to them they believed that the deed was not to be made till all the purchase-money was paid, that is for five years. Johnson cannot be held responsible for such a statement by Clarke. And it seems to me, if he made such a statement, it was so improbable, that if the securities had been unwilling to sign this bond otherwise, they, as ordinarily prudent men, ought to have made enquiry of Johnson. But I cannot think that Clarke ever intended to make such an impression on the minds of his sureties. His acts seem to relieve him from the charge of committing a fraud on his securities and friends; for very shortly after he procured the deed from Johnson he had it recorded. The strong probability was that his sureties would learn from this act of his that the deed had been made and the vendor's lien not reserved. It seems highly improbable that a man like Clarke, standing high in the community, would practice a fraud on his friends, and then put on record the means by which they could detect him in such fraud. He probably spoke of this land he bought as increasing his means of paying this bond; but I do not think he could have intended to deceive his sureties by making them believe that a lien was to be retained on it for their benefit.

It is claimed, however, that as the bond stated on its face that it was given for the purchase of a tract of land, when in fact only $1,840.00 of it was given for land, and $160.00 of it for cattle, this amounted to a misrepresentation, with Johnson's knowledge, of a material fact; and that such misrepresentation vitiated the entire contract of the sureties. In the first place this can hardly be fairly said to be a misrepresentation of existing facts. It was not then understood by either Johnson or Clarke,

6

that the consideration of this bond was $1,840.00 worth of land and $160.00 worth of cattle. On the contrary, the bond was really given for the purchase of land only ; but as the bond was to be given at once, and the land was to be afterwards surveyed, it was understood that if it should turn out that there was less than fifty acres of land, the land being sold at $40.00 per acre, the difference, if any, should be credited on a previous sale of cattle to Clarke. I do not regard this recital in the bond as an intentional misrepresentation, if it can be regarded as a misrepresentation at all. It is more properly, perhaps, to be regarded as a failure to disclose a not very material part of the contract ; and the failure not being induced by any fraudulent motive, it could not vitiate the contract. But even if the quantity of land had been known to the parties, I cannot think this misstatement of the consideration of the bond would have vitiated the contract. It is not so material a misstatement that, under the circumstances we have stated, the high credit of the principal with the securities and the community generally, it would have had an influence on the securities in determining whether they would sign the bond. And if as reasonable men the fact that $160.00 of this bond was for cattle and not land, could not have influenced their action had it been known to them, then the fact that this was not communicated to them, will not in correct principle vitiate the bond as to them. I cannot believe that the fact that Clarke got land valued at $1,840.00 instead of $2,000.00 could have prevented them from signing a bond not payable for five years.

I am therefore of the opinion that the decree of the circuit court complained of was not prejudicial to appellants. But it was prejudicial to the appellee, Thomas Branch, as it refused to permit him to enforce this $160.00 out of the securities. If the securities had been injured by fraudulent or improper suppressions of facts or by improper misrepresentations when they signed this bond, no part of it should be enforced against them ; but if, as

we think, they were not, then they are bound by their 1879 Special Term.
Warren et al.
v.
Branch et al. contract; and they should be required to fulfil every part of it. I know no case where sureties have been held under such circumstances to fulfil a part of their contract and have been released from the fulfilment of another part. It is an entire contract; and the whole of it should have been enforced against them. I am therefore of opinion, that on the counter assignment of error by the appellees the decree of the circuit court of October 17, 1877, must be reversed; and that the appellees, Johnson & Branch, should recover of the appellant, J. S. Warren, their costs about this appeal, and a decree should be rendered dissolving the entire injunction awarded in this cause with costs against the plaintiffs in favor of the defendants, Branch & Johnson.

JUDGES HAYMOND AND JOHNSON CONCURRED.

DECREE REVERSED.