# Wheeling.

## HEVENER *v.* BERRY *et al.*

### Decided December 18, 1880.

1. A. owes B. a debt evidenced by a note secured by a lien on A.'s real estate. C. executes to B. a note of like amount as collateral security for A.'s debt. If C. pays the note executed by him as collateral security, he is entitled to be substituted to the benefit of the lien on A.'s real estate given to secure the original debt. This right of C. to such substitution will not be affected by the assignment by B. to D. of the original note with the knowledge of C. ; nor by the fact, that D. with B.'s consent paid to the original debtor the whole of the consideration to be given by him for the original note; nor by the fact, that C., when he signed the note given as collateral security, was ignorant that there was any lien on A.'s real estate to secure the original note.

2. The demurrer to the bill and amended bill in this case were properly overruled. (See these in the statement of the case.)

Appeal from a decree of the circuit court of the county of Pocahontas, rendered on the 3d day of May, 1877, in a cause in said court then pending, wherein Uriah Hevener was plaintiff and Albert S. Berry and others were defendants, allowed upon the petition of said Berry.

Hon. H. A. Holt, judge of the eighth judicial circuit, rendered the decree appealed from.

MOORE, JUDGE, furnishes the following statement of the case :

The record shows, that A. S. Berry instituted an action

of debt in said court against D. S. Hounshell, Lucy Hounshell and Uriah Hevener, upon the following writing :

"$3,000.00.    "NEWPORT, KY., Nov. 6, 1872.

"One year after date, we promise to pay to Albert S. Berry, or order, $3,000.00 for value received, to bear interest at rate of ten *per cent. per annum* from maturity.

"D. S. HOUNSHELL.
"LUCY HOUNSHELL.
"URIAH HEVENER."

Endorsed.—"A. S. Berry."

On the 5th day of October, 1875, the said circuit court entered the following judgment : "This day came the parties, by their attorneys, and the defendants waiving their plea by them pleaded, confess judgment for $3,575.00 with interest after the rate of ten *per centum* from the 4th day of October, 1875, till paid. Therefore it is considered by the court, that the plaintiff recover the sum aforesaid with interest thereon as aforesaid and his costs by him about his suit in this behalf expended." Upon that judgment *fi. fa.* issued, which was levied upon Hevener's property, and to prevent the sale thereof, Hevener gave a forthcoming or delivery bond, with Samuel B. Hannah and Wm. L. McNeel as his sureties therein. Upon the usual notice judgment was entered upon said bond by said court May 4, 1876, against the said Hevener, Hannah and McNeel for the sum of $3,790.86 with interest thereon from the 12th day of January, 1876, till paid, and costs. Henever moved to quash said notice ; but the court overruled the motion. Nothing in the record discloses the ground of the motion; and no bill of exceptions appears to have been taken and filed.

On the 5th day of August, 1876, Uriah Hevener filed his bill in chancery, praying for the writ of injunction against Berry, to inhibit and restrain him from enforcing and collecting said judgment, and the writ was awarded him by a circuit judge on the same day.

The bill alleges that complainant, Hevener, and Hounshell are brothers-in-law, having married sisters; that Hounshell in 1869 purchased of Berry a house and lot in Newport, Ky., and Berry and wife made a deed December 29, 1869, thereto in favor of Lucy, wife of said Hounshell, in which was reserved a vendor's lien for $4,500.00, balance of the purchase money thereon, $1,500.00 to be paid December 1, 1870, $1,000.00 at the end of each year for two successive years thereafter, and the residue to be paid at the end of three years from the last day of December, 1870, and for which deferred payments the defendants, Lucy and D. S. Hounshell executed their promissory notes to the said A. S. Berry, dated December 31, 1869, which transactions are recited in said deed, a copy of which the bill exhibits. It also alleges that Hounshell wrote to Hevener, informing him that the three notes were due, and he wanted to raise $3,000.00 to pay on his said property: "that if plaintiff (Hevener) would assist him by going in as security on a note of that amount with him and his wife, due in one year, which was enclosed, that he could raise the money for Berry by loan from an insurance company, and as he was getting a fine practice as attorney, he would be able to meet it, when it fell due; and this plaintiff (Hevener) after some reflectio knowing that it was the custom of safe business men in conveying property, where any portion of the purchase-money remained unpaid, to reserve a vendor's lien to secure the same, and being desirous to assist his brother-in-law and sister-in-law, if he could without incurring the whole liability himself, signed the note and returned it to said Hounshell. A copy of the note is exhibited with the bill.

The bill further complains that judgment was taken against complainant in this State, instead of suit being brought in Kentucky against Hounshell and wife, on their enforcing the lien on the property sold them; that execution was sued out and levied on the property of Hevener, and a forthcoming bond, with Samuel B. Han-

nah and Wm. L. McNeel as sureties was given by Hevener to prevent sale of said property, upon which judgment was entered against Hevener and his said sureties, for $3,790.86, with interest from January 12, 1876, till paid and costs; that soon after the judgment first mentioned was rendered. Hevener went to Kentucky to see Berry and Hounshell, to make some arrangements whereby he should not be compelled to pay the debt of his principals, and then for the first time learned that Berry and Hounshell were partners in the practice of law, and Berry did not seem disposed to press his said judgment against him, and said that he had retained a lien in his conveyance of the property, and that Hevener was safe, even if he had it to pay; that soon after his return from Kentucky execution was sued out, and he was thus forced to give the forthcoming bond; that being informed that under a statute of Kentucky he could by suit in chancery compel Berry to proceed against the principals in the note of $3,000.00, and first exhaust the remedies he had against them before he could collect the debt off of him (Hevener), who was but a surety, he instituted said suit, and in his bill charged that the vendor's lien had been retained on the property conveyed by said Berry to said Lucy Hounshell, to secure the money thereof unpaid, and that the said note for $3,000.00 was a part thereof; and in the defendant's (Berry's) answer to said bill, to the surprise of complainant, he (Berry) set up as a defence: "that he (Berry) had, when he had secured the $3,000.00 note with plaintiff as security, *released* said lien, and acknowledged full satisfaction thereof by endorsement on the record to that effect, which now seems to be the fact, as shown by endorsement on the margin." But complainant charges that said releasement, although dated contemporaneously with the note, was not executed until some time after the note was executed and delivered; and he further charges and avers that it was not entered or made until after plaintiff's said suit was instituted in a chancery court in Kentucky.

Complainant alleges belief of collusion and fraud between Hounshell and Berry to collect $3,000.00, with interest at ten per cent. from complainant, without any consideration therefor, and so charges; and alleges that Berry, by releasing the vendor's lien on the property purchased, which was a co-surety with him in securing said sum of money, thereby released him from any liability for the said money mentioned in said judgments. The bill prays that Berry, his agents, &c., shall be inhibited and enjoined from the collection of said judgments, and for general relief.

Berry demurred to and answered the bill August 28, 1876, in which he admits the bill correctly states the sale of the house and lot, the deed executed and the notes given therefor, as well as the cash-payment made at the time of the sale, but respondent states, that when the third deferred payment was about to become due, the first and second being then long since past due and wholly unpaid, in the fall of 1872, the said defendant, D. S. Hounshell, told him, if he would release the lien retained in the deed for said property to secure the unpaid purchase-money, he could and would, with the help of a friend and brother-in-law in West Virginia, he meaning as respondent afterwards learned the plaintiff, Uriah Hevener, a man of large wealth, who desired to aid him either by sending him the money, or giving security for himself and wife upon a note, pay him the sum of $3,000.00 upon said property; that thereupon, having full confidence in the statement and assurance thus given him, and wishing so far as possible to comply with the wishes and requests of said Hounshell, he on the 6th day of November, 1872, released the lien retained as aforesaid, as shown by the deed with the endorsement thereon filed with the bill; and that some month or two thereafter the said Hounshell brought him the note for $3,000.00 signed by himself, wife and Uriah Hevener, which he accepted, and upon which the judgment mentioned in the bill was obtained."

Further answering respondent says, that "the said note though, dated on the same day with the said release of lien, was not executed and returned by the said Hevener until some time in January or February, 1873, and at that time there was no lien in said deed for the unpaid purchase-money, and of course the said Hevener did not and could not rely upon such security for his ultimate protection;" and respondent denies that Hevener knew there had ever been such a lien, or had any thought of it, when he gave the said note; on the contrary, he is advised and states that he became security for the said Hounshell on account of his great affection for his brother-in-law and his high regard for his distinguished abilities and good qualities, and his great desire to help him on to success in his profession; that he, Berry, looked to Hevener for payment, when the note was due, and brought suit against him on the common law side of the circuit court, because it was his right, and because he saw no prospect to make the money off of the other obligors; that the note did not bind the separate estate of Mrs. Hounshell, and in addition to this her property after the said release of lien had been mortgaged by herself and husband for a large amount to an insurance company, from which they had effected a loan." ·

Respondent denies that he told complainant, that "he had retained a lien in his conveyance of the property, that plaintiff was safe even if he had it to pay." He also denies, that the said release was executed after the note was executed and delivered, and alleges, that though of even date with the note, it was really prior in point of time by at least one month and probably two. He still more denies, that it was executed after the institution by plaintiff of his chancery suit in Kentucky. He denies all the charges of fraud and collusion, and alleges, that he never saw said Hevener, until after the judgment had been obtained on the note, and he never had any intercourse with him, until after the debt was due, when he

wrote to him for payment; that all that Hevener did in the matter was done at the instance and request of and through his said friend and brother-in-law, whom he thus, as to respondent, constituted his agent; and if any fraud or imposition was practiced upon him, which respondent denies, it was done solely by his said friend and agent, and for it respondent is in nowise responsible; and the answer closes with a general denial of each and every allegation of the bill; not in said answer before expressly admitted, and prays dissolution of the injunction and dismissal of the bill.

The depositions of Hounshell and Berry were taken September 16, 1876.

Afterwards Hevener filed an amended bill, but the record does not show when; it is, however, sworn to September 28, 1876, in which he alleges, that "there are some facts connected with the transaction which at the time of the filing of the original bill were to this plaintiff unknown." He then substantially alleges, that the note bearing date November 6, 1872, upon which judgment was recovered against him, was signed by him about the 11th day of February, 1873, and returned to said D. S. Hounshell; that on the 6th day of November, 1872, the defendants, Hounshell and wife, took up the several notes executed by them for the purchase-money on the house and lot described in the deed to Lucy Hounshell, and in their stead executed as of November 6, 1872, their two notes, one for $3,000.00, due in twelve months thereafter, and one for $2,360.00, due eighteen months after date; at the same time Hounshell and wife gave to said Berry a mortgage-deed on said house and lot to secure the payment of the said two notes, (a copy of the mortgage is exhibited); that when said mortgage-deed was delivered to Berry, he, Berry, then released the vendor's lien he had retained on the house and lot for the $4,500.00, by a writing on the margin of the book, and when Hounshell received the note which had been signed by Hounshell and wife, and then signed by plaintiff and returned, said

Hounshell placed it in the hands of Berry as further security for the balance of the purchase-money on the house and lot; and while the defendant, Berry, held the said mortgage, if plaintiff had been compelled to pay his said note of $3,000.00, upon which judgment has been rendered, he would have been saved harmless, at least to the extent the house and lot would have sold for, as he would have been as security subrogated to the rights of Berry in the mortgage, which was existing when he executed and delivered the same; but said Berry has placed it beyond the power of plaintiff even to recover anything off of said D. S. and Lucy Hounshell, should he pay said judgment, by transferring said mortgage, as shown by endorsement duly acknowledged on same, as said Hounshell and wife have no other property, and which goes to sustain the charges in the original bill of an attempted fraud on plaintiff by Hounshell and Berry; that having received the value of the notes and mortgage of the Clay Fire and Marine Insurance Company, thus being paid the balance of the purchase-money on the house and lot, said Berry now seeks to recover this further sum for this plaintiff, &c.

To this amended bill, Berry demurred and answered. When the answer was filed does not appear, but it was sworn to by Berry October 28, 1876. He denies the allegations of the amended bill, that the $3,000.00 note was placed in respondent's hands, "as further security for the payment of the balance of the purchase-money on the house and lot, and that plaintiff would have been entitled to subrogation to the lien, &c., and also, that respondent has perpetrated any fraud upon plaintiff; and the answer then proceeds :

"And this respondent proceeding to give a full and correct statement of the transaction in the said amended bill mentioned, says, in addition to the matters and things set forth in his answer to the original bill in this cause, and which he asks may be taken and read as part of this answer, that in the fall of 1872, when the said Hounshell

and wife were indebted to him between $5,000.00 and $6,000.00 on the house and lot, the said D. S. Hounshell made known to him, that he was greatly in need of money and was anxious to effect a loan of some $3,000.00; that he could get said sum upon loan from the Clay Fire and Marine Insurance Company, of the city of Newport, provided he could secure it by a first lien or mortgage upon said property, and this he could not do because this respondent had a lien retained in his deed for the said unpaid purchase-money; he then proposed to your respondent, that if he would aid him to borrow said sums by releasing his said lien or transferring it to the said insurance company to the extent of the said $3,000.00, he would give him in its stead ample and unquestionable personal security by the help and in the person of an affluent and liberal brother-in-law in West Virginia, meaning the plaintiff, Uriah Hevener. Your respondent consented to do as he wished, and to that end a calculation of said indebtedness was made on the 6th of November, 1872, and found to amount to $5,360.00; your respondent then released his said vendor's lien retained as aforesaid, and permitted the said Hounshell and wife to execute to him two notes therefor, one for $3,000.00, at twelve months, the other for $2,360.00, at eighteen months, from November 6, 1872, which were secured by a mortgage upon said property given by said Hounshell and wife; and thereupon immediately this respondent on the same day, November 6, 1872, as he had agreed to do, relying upon the personal security to be given as aforesaid, allowed the said Hounshell to have the use and benefit of the said $3,000.00 note, and on that day, at his instance and request, and relying upon his said promise, assigned and transferred said note, with the mortgage securing it, to the Clay Fire and Marine Insurance Co., which at once paid over to the said Hounshell the said sum, who took, used and enjoyed every dollar of it, it being apparently a loan from said company, but really a loan of the note and lien from this respondent, to be repaid and

returned by said note, to be given with personal security; and the said first note is still held by the said insurance company, and is wholly unpaid, and the said company, in August, 1874, had the said transfer and assignment acknowledged and recorded. And this respondent avers, that the sole object in view in changing the lien and taking new notes was to aid said Hounshell to get said loan more easily and satisfactorily; that it was only done at his urgent instance and request, and then only upon his promise to replace said note thus lent him by one with ample personal security.

"Further answering, this respondent says, in the month of February, 1873, the said Hounshell brought to this respondent the note upon which the judgment now enjoined in this suit was rendered, executed by himself and wife and the plaintiff, Uriah Hevener; that he brought it in accordance with his said promise, and gave it to this respondent, by whom it was accepted in lieu of the note lent as aforesaid. This respondent knows nothing of what may have passed between Hounshell and Hevener about the execution of said note, except so far as he has since learned it from them and from an inspection of their letters filed as exhibits with their depositions in this cause; nor could he, as he is advised, be prejudiced thereby, even were it prejudicial in its character, but he avers, and the said letters show, that the plaintiff in lending his name to his brother-in-law had no thought of nor fear for his ultimate security; that he relied simply and implicitly upon his brother-in-law, for whom he had equally great affection and admiration, and that he looked to and relied upon no possible lien, and none such there was, to protect him; and the said note of the plaintiff, though executed and delivered in February, 1873, was executed and bore date as of November 6, 1872, so as to correspond with and exactly replace the said note lent to Hounshell, with which also as to maturity and rate of interest it was identical.

"Further answering, this respondent says, not only

is the said note now held by and belonging to the said company wholly unpaid, but so also is the other note for $2,360.00 in a great measure unpaid, though long since due, though the said Hounshell has paid something upon it.

"Further, this respondent denies all the allegations in the said amended bill contained not hereinbefore expressly admitted. And having fully answered, he prays that the injunction awarded the plaintiff may be dissolved, his bill dismissed, with costs, &c."

It was agreed that the foregoing answer might be read as the deposition upon notice of Berry, as well as his answer; therefore it has been set out at length.

On the 7th day of December, 1876, in vacation, on a motion to dissolve the injunction, Judge Holt of the said circuit court rendered the following decree:

"This cause was this day heard upon the process returned 'executed on the home defendants,' the order of publication duly taken, published and posted against the non-resident defendants, the original bill and amended bill of plaintiff, the demurrer of defendant A. S. Berry to each of said bills, the answer of said defendant to said original bill, also his answer to said amended bill, which last answer is by agreement of parties to be also taken, treated and read as the deposition of said Berry regularly taken upon notice duly served, joinders in said demurrers, general replications to said answers, exhibits, depositions, exceptions thereto, the motion of defendant Berry made upon notice to dissolve injunction heretofore awarded, and argument of counsel. Upon consideration whereof, the Judge proceeding to decide said motion to dissolve only, and those things necessarily involved therein, doth adjudge, order and decree that the exceptions of defendant Berry taken to certain questions and answers of deponent Hevener, as endorsed on his deposition, be sustained; and the Judge is of the opinion upon the facts, as they now appear from the pleadings and evidence, that nothing has been done entitling plaintiff to exoneration, but that on his payment of said judgment

he would be entitled to substitution to said mortgage-lien *pro tanto* on said house and lot, inasmuch as he executed said note on which said judgment was obtained as the surety of defendants, David S. and Lucy Hounshell, for that amount of the purchase-money of said house and lot for which the vendor's lien was by defendant Berry released, and in lieu thereof said mortgage thereon executed and taken, which note thus secured by said judgment and by said mortgage, and said mortgage securing the same appear to be now the property of the Clay Fire and Marine Insurance Company, of Newport, Ky; and the Judge would now take the proper steps and order said money to be at once collected off plaintiff Hevener and his sureties, and paid into court to the credit of this cause, but in view of the action of the court in this behalf overruling said motion to dissolve, the parties, regarding said fund as well secured and on interest, dispense for the present with having said money collected and paid into court; and the judge regarding said insurance company as a proper party, plaintiff is ordered to amend his bill, making said company a party defendant. And doth further adjudge, order and decree that said motion to dissolve said injunction, and said demurrer, so far as passing upon them is necessarily involved in the consideration of said motion, be and the same are hereby overruled. And the question of costs and the adjudication of all other matters are reserved for future hearing."

Obedient to that decree, the plaintiff amended his bill, by making the Clay Fire and Marine Insurance Company, of the city of Newport, Kentucky, a party defendant, and required it to answer and state, "to whom it paid the money on the note of $3,000.00 of D. S. and Lucy Hounshell, executed November ——, 1872, to A. S. Berry, and whether it holds said note, and whether any portion thereof has been paid."

The said company demurred to and answered said amended bill; in its answer it says it knows nothing

about and has no interest in the matters in controversy in this suit ; that it has no title or claim of any sort to the note upon which the judgment enjoined in this suit was obtained, and never heard or knew of its existence until very recently, and since it was ordered to be made a party ; that it has no acquaintance either business or personal with the plaintiff, Hevener, and never had with him any intercourse or communication of any sort whatever, and certainly never held and does not now hold, any debt or claim against him, either as principal or surety ; but that it does hold a note of D. S. and Lucy Hounshell, endorsed by A. S. Berry, for $3,000.00, dated November 6, 1872, payable one year after date, with interest at ten *per centum per annum* from date, and secured by a mortgage upon a house and lot in Newport, Kentucky ; that the note was discounted by respondent for, and the proceeds thereof paid to, the makers of said note as above mentioned, and that said note, although long since due, still remains wholly unpaid, and respondent for payment of same looks to and relies upon the said makers and endorser of said note, and the said mortgage.

Certain interrogatories were propounded to Berry, and answered by him March 28, 1877, which are, so far as is necessary, considered in the opinion. The depositions of complainant, Hevener, were taken September 28, 1876, and March 28, 1877.

On the 3d day of May, 1877, the court rendered the following decree :

" This cause came on this 3d day of May, 1877, to be heard upon the papers formerly read, upon the amended bill making the Clay Fire and Marine Insurance Company, of Newport, Kentucky, a defendant, the answer of said insurance company, and replication thereto, depositions taken since the last decree entered in this cause, and upon arguments of counsel. Whereupon the court proceeded to render its opinion in the cause, and the plaintiff asked leave to file an amended bill to meet the facts of

the case as now developed, to the filing of which the defendant, Berry, by counsel, objected, which objection was sustained by the court; and the court being of opinion that the note on which judgment was rendered against the plaintiff was given as security for the payment of the first $3,000.00 due on the house and lot purchased by defendant, Lucy Hounshell, of A. S. Berry, and that the plaintiff has a right to see the money paid on the judgment against him so applied on the said first payment of $3,000.00—that when paid said plaintiff should be substituted to the mortgage lien, therefore it is adjudged, ordered and decreed that the plaintiff pay the amount due on the judgment enjoined in this suit, with ten per cent. interest from the date of injunction, to A. F. Mathews, who is appointed a special receiver for the purpose, and is required to give bond, with approved security, in the penalty of $7,000.00, to be approved by the clerk, conditioned according to law, and execution is awarded in the name of said receiver against the plaintiff and his securities on the forthcoming bond, to be entered "no security to be given." And it is further adjudged, ordered and decreed that the money when paid to said receiver shall be paid over to the insurance company or its attorney upon condition that it first transfer or assign to the plaintiff, without recourse on it or on A. S. Berry, its assignor, the mortgage on the house and lot in the bill and proceedings mentioned, so far as said mortgage secures the note of $3,000.00; and should the said company decline to receive said money or to assign the benefit of the mortgage to the plaintiff, the court will hereafter make such disposition of the fund as to it may seem proper; and all further directions, including the question of costs, are left for future determination."

From this decree an appeal was granted Berry upon petition assigning as errors:

1st. The overruling the demurrers to the original and amended bills.

2d. In overruling the motion to dissolve the injunc
tion upon the merits of the case as presented by the
proofs and pleadings.

3d. In deciding that the note, upon which said judg-
ment was rendered, is now the property of the Clay
Fire and Marine Insurance Company of Newport, Ken-
ucky.

4th. In requiring the complainant to amend his bill
and make said insurance company a party-defendant.

5th. The judge erred in his decision even if the proofs
made out the facts as he understands them, because there
are no allegations in the pleadings to which such proofs
could apply.

6th. In the decree at the May term, 1877, the court
erred in not sustaining the demurrer of the Clay Fire
and Marine Insurance Company to the second amended
bill, said company not being a necessary or even a prop-
er party, there being nothing to connect it with the contro-
versy, or to show that it had any interest in the result.

7th. The seventh assignment of error is in effect the
same as previously assigned, and, therefore, not neces-
sary to be repeated here.

*Mathews & Mathews*, for appellant, cited the following
authorities :

10 W. Va. 718; Big. on Fraud 450, n. 1, 451 ; 2 Am.
L. Cas. 441, 446–449 ; 9 Wheat. 532 ; 9 W. Va. 483;
2 W. & T. L. Cas. in Eq. 2d pt. p. 722; 7 Leigh 157 ;
Hill. on Inj. 177, 178, 186, 187 ; *Id.* 189, 191, § 31, 192;
193 and n. ; 7 Clark 173; 9 Gratt. 40; 6 W. Va. 79 ;
1 Wash. 142 ; 1 Call 224 ; *Id.* 546 ; *Id.* 147 ; 2 H. &
M. 13; *Id.* 139 ; *Id.* 408 ; 4 H. & M. 491; *Id.* 470 ;
*Id.* 438 ; 2 Munf. 1 ; *Id.* 224 ; 4 Rand. 336 ; *Id.* 553;
6 Rand. 1 ; 2 Leigh 334 ; 5 Leigh 359 ; 7 Leigh 157 ; 5
Leigh 364; 7 Leigh 227 ; 6 Leigh 530 ; 7 Leigh 238 ;
5 Leigh 444; *Id.* 119 ; 9 Gratt. 255 ; 4 Gratt. 147 ; 9
Gratt. 40; *Id.* 379 ; 10 Gratt. 228 ; *Id.* 499 ; *Id.* 506 ;
11 Gratt. 625 ; 13 Gratt. 511 ; 22 Gratt. 136 ; 24 Gratt.

548 ; 25 Gratt. 146 ; 26 Gratt. 67 ; 2 W. Va. 491 ; 4
W. Va. 115 ; 5 W. Va. 391 ; *Id.* 43 ; 6 W. Va. 186 ;
7 W. Va. 269 ; 11 W. Va. 654 ; 3 Law & Eq. Report.
No. 8, p. 233 ; 3 Dan. Chy. 1840–44 ; 2 Story Eq. Jur.
§§ 885, 887, 894–897 ; Adams Eq. (1868) 197 n. 1 ;
2 L. Cas. in Eq. (1852) 2d pt. 89, 97–109 ; 22 Miss. 144 ;
1 Chand. (Wis.) 198 ; 6 Fla. 546 ; 7 Humph. (Tenn.)
299 ; Abb. Dig. 1st Series, vol. 7, Injunction p. 452, §§
50, 64 ; *Id.* 466, § 337 ; *Id.* 467, § 376 ; *Id.* 468, §397 ;
*Id.* 469, § 414 ; *Id.* 472, § 470 ; *Id.* 473, § 490 ; *Id.* 474,
§§ 502, 508 ; *Id.* 475, § 516 ; *Id.* 476, § 545 ; *Id.* 492,
§ 837 ; *Id.* 494, § 869 ; *Id.* 495, § 896 ; *Id.* 509, §§ 1183,
1190 ; 9 Wheat. 332 ; 2 Am. Lead. Cas. 372 *Id.* 449 ;
23 Gratt. 383.

*J. M. McWhorter*, for appellee cited the following
authorities :

Hill. on Inj. 196, § 36 ; 2 Ves. Jr. 540 ; Code, ch.
131, §8.

MOORE, JUDGE :

So far as the record presents the questions in this case,
I think the principles governing them have been fully
elucidated in *Warren et al.* v. *Branch et al.*, 15 W. Va.
21, wherein Judge Green collated the authorities bear-
ing upon the questions vital to this case, and the court
enunciated these principles :

" 2d. When with the knowledge and assent of the
creditor there is a misrepresentation with regard to ma-
terial facts, and had the real facts been known and not
misstated, they might reasonably have prevented the se-
curity from entering into his contract of suretyship, such
contract will not be binding on the surety, though such
misrepresentation was not made with a fraudulent pur-
pose.

" 3d. Unless enquired of by a surety, a creditor is un-
der no obligation to disclose facts in no manner connect-
ed with the business which is the subject of the surety-

ship, though such facts would probably have a decided influence on the surety in determining whether he would enter into the contract.

" 4th. If a material fact connected with the contract of suretyship, which might influence the surety in entering into the contract, is fraudulently concealed with a view to benefit the creditor, such concealment, though no enquiry is made by the surety, would discharge him.

" 5th. But though the simple failure of a creditor to communicate to a surety a fact material for the surety to know, and though this fact be connected with the contract of suretyship, will not generally vitiate the contract, unless the concealment by the creditor was fraudulent, even though the principal in procuring the surety to enter into the contract acted fraudulently; yet if the dealings are such as fairly to lead the creditor, if a reasonable man, to believe that the principal *must* have used fraud by suppressing facts or otherwise, in procuring the surety to enter into the contract, and such fraud has been used, it will vitiate the contract as to the surety, though no actual fraud be traced to the creditor.

" 6th. If a contract is made for the sale of land, and nothing be said in the contract about the vendor's lien being reserved, and bond and personal security be taken for the purchase-money, this alone will not amount to a waiver of the vendor's lien; but if it be shown by direct evidence, or by the circumstances of the case, that the vendor relied only on the bond and personal security, the vendor's lien is waived, and he would be required to execute a deed without reserving the vendor's lien. Before the passage of our statute requiring an express reservation of this lien on the face of the deed, the execution of a deed and the taking of personal security would amount to a waiver of the vendor's lien."

The bill and amended bills seek, on the part of Hevener, to avoid the judgment enjoined: First. Because of the release of the vendor's lien, by Berry, on the house and lot, which Hevener claims was co-sure-

ty with him in securing to Berry the payment of the $3,000.00 note, and that it was released without his knowledge or consent, and in fact that he first learned of its being released after the judgment was obtained; Second. Because there was collusion between the defendants, Berry and Hounshell, to defraud Hevener out of the $3,000.00 with its interest. The plaintiff, had a clear right, not only under the statute, Code, ch. 126, §§ 5 and 6, but also under the general principles of equity, to waive his. defence at law and seek relief by injunction against the judgment in a court of equity, and to show the fraud if it existed, for as said in Hilliard on Injunction, page 196, § 36, "Fraud is another ground of injunction, and this, although the party might find a remedy in a court of law, or though he had notice of the judgment in time to appeal, and made an abortive attempt to do so." See also Kerr on Fraud and Mistake pp. 43, 44 and 47, also *Smith* v. *McLain*, 9 W. Va. 654.

Whilst it is true the allegations of the bill are not as specific, as might be inferred from *Smith* v. *McLain* they should be, to enjoin the judgment, yet they sufficiently show that class of ignorance, unmixed with negligence, which under the peculiar circumstances of the case would permit.equity to relieve him, if the facts of the case are true as he presents them by his bills. As said in Bigelow on Fraud, page 46, "He is guilty of a fraud who secretly changes a state of affairs, and then, without revealing this fact, procures another to do an act into which the true state of affairs enters as a motive," as for example, where "a creditor knowing that his debtor is in failing circumstances, obtains from him for part of his claim a mortgage, substantially covering all of his property, and gets the debtor to obtain the endorsement of another person, for another part, without revealing the fact of the mortgage, this is a fraud upon the endorser, and discharges him from liability." Hevener, by his allegations of Berry's release of the vendor's lien on the

property purchased by Hounshell, and the procuring of his (Hevener's) signature to the $3,000.00 note to secure the purchase-money on the property thus relieved from the vendor's-lien, without the knowledge and consent of Hevener, attempts to bring the case within the principle as laid down by Bigelow.

Whilst it is true, as before stated, that the bill and amended bills are not as specific and direct in the charge of fraud, or the allegations of the circumstances showing fraud, or collusion with intent to defraud, as the principles of good pleading require, yet they show upon their face sufficient to induce a court of equity to take cognizance of the case, and enter upon an enquiry into the merits; and therefore it was proper to overrule the demurrers to the bill and amended bills; and certainly so as to the second amended bill, because the pleadings had already shown that the insurance company had been connected with the transaction to such an extent as to make it a question whether the note of $3,000.00 it held was not in fact for the same money as that of the note upon which Berry had obtained judgment against Hevener. If so, then it is manifest, that it would be inequitable to permit Berry to have the benefit of both notes, and to collect both; but if both notes were intended to secure the same money to Berry, and the note held by the company was secured by the mortgage, and the judgment on the note against Hevener was intended to pay off the mortgaged note, certainly equity would come to the relief of Hevener and subrogate him to the rights and equities of the company and of Berry, upon his payment to the company of the amount of the mortgage-note. It was therefore right to make the company a party defendant so as to ascertain its interest in the subject-matter, and what were the true state of facts, that justice should be done in the premises to all parties.

Having thus disposed of the question of jurisdiction, we must now enter upon the merits of the case, and see to what extent they are governed by the principles of

law and equity we have cited, and bearing in mind that "no facts are properly in issue, unless charged in the bill; and of course no proofs can be generally offered of facts not in the bill; nor can relief be granted for matters not charged, although they may be apparent from other parts of the pleadings and evidence; for the court pronounces its decree *secundum allegata et probata*." Story Eq. Pl. § 257; Cooper's Eq. Pl., pp. 5, 7, § 28.

Berry, in his answer, denies the charge of fraud and that he colluded with Hounshell to defraud Hevener. Hevener is therefore put to the proof of his allegations, and calls upon the court to take into account all the circumstances of the case. He admits in his argument, what the evidence discloses, that Berry was not known to him, and took no part in procuring his signature to the note, so far as he, Hevener, knew or was concerned; that Hounshell alone corresponded with Hevener in regard to his going security for the deferred payments on the house and lot. Hevener's deposition was twice taken in the case. In his deposition of September 28, 1876, he says: "Berry told me that Hounshell was to pay him $6,000.00 for the house; that he had made him a cash payment of $1,500.00." I don't know that Berry told me how the deferred payments were to be made, but the residue, Berry told me, was $4,500.00. In answer to a question, as to how he came to execute the note, he answered: "It was through Hounshell's own agency. The whole scheme was concocted by Hounshell. D. S. Hounshell wrote me a letter asking me to give him a power of attorney, which I refused to do," (the letter is filed with the deposition). "Sometime afterwards I received a letter for Hounshell" (also copy filed with deposition) "enclosing the note, which he asked me to go on as security, which note I signed and returned to him." To the best of his recollection he executed the note February 11, 1873, and his object in doing so was that he "was led to believe by Hounshell that he could get time by giving an endorser or security; that he, Houn-

shell, was engaged in some important suits, from which he would realize some handsome fees, and would be enabled to pay it off when it fell due"; that since the judgment, on the 12th of November, 1875, Berry told Hevener that he held a lien for all the unpaid purchase-money, and that the note which he, Hevener, signed, was a part of the unpaid purchase-money ; that he had a talk with Berry, November 12, 1875, in substance this : that he asked Berry why he sent the note to Pocahontas and sued him on it, when Berry was secured by lien on the same property for the same debt ? Berry replied to him that the property had so depreciated in value that it would not bring the amount of the unpaid purchase-money, of which this debt is a part. Hevener then remarked to Berry that he (Berry) and Hounshell were partners in the practice of law, and that they could arrange this matter and release him (Hevener) from paying the judgment. Berry then remarked that Hevener " had better pay the debt; that Hounshell and he (Berry) were doing a splendid business, and that Hounshell in a year or two would be able to pay him (Hevener) back." Hevener replied that he was not in circumstances to pay the debt, and he hoped Berry and Hounshell would arrange it. Berry did not say he would, but said he had business in Cincinnati, that he would be gone a few hours, and that he would return and confer with Hevener and Hounshell in reference to the matter. The boat left at 4 o'clock, and he (Hevener) could not wait longer, and Berry had not returned, Hounshell promised to see Berry with regard to the matter, and write to Hevener by next mail, but neither Hounshell nor Berry wrote him in relation to the matter. Hevener then commenced suit in Kentucky, to subject the property to sale for the unpaid purchase-money, of which he considered this debt a part. He filed what purported to be a record of that suit as a part of his deposition. (The record does not show that the Kentucky suit was ever terminated.)

Twice after that he tried to get Berry and Hounshell together at Newport, but failed; he could get them to talk separately, but never together. He told Berry that if he did not arrange this matter, he would bring suit to compel him to exhaust his remedy against the principal by enforcing his lien, to which he made no reply. Hevener then directed the suit to be brought. That the first time he, Hevener, learned of the release of the lien was on June 10, 1876; that it then appeared the mortgage had been given, which is made part of the amended bill.

On cross-examination Hevener says, he learned through a letter from Mrs. Hounshell to his wife, that there was a lien for unpaid purchase-money; and that was all he knew except what Hounshell communicated. He further says: "I never saw or knew Berry until the 12th day of November, 1875. He wrote to me after the note fell due, or about that time. He never persuaded or induced me to sign the note. Hounshell led me to believe, that he gained time by my endorsement, was the reason I had signed the bond." Hevener again testified, April 30, 1877, that Berry told him, at Newport, in the fall of 1875, that he had gotten $2,000.00 out of the $3,000.00 from the insurance company; that Hounshell had gotten $700.00, and the insurance company had retained $300.00 for the one year's interest. To the question, "What was your object or purpose in going security on the note with Hounshell and wife?" Hevener answered, "Hounshell told me, that he had several important cases in which he was to get large fees; that they would be decided in twelve months, and that he would then get the money to pay for his house, and I went on the note to give him further time."

Hounshell, the brother-in-law of Hevener, and the law partner of Berry, testified, that in the latter part of August, or early in September, 1873, (corrected afterwards by him to 1872), he went to Hevener's residence in Pocahontas county to ask a loan of money from him

to make a payment to Mr. A. S. Berry upon the house in Newport, Kentucky; that Hevener expressed a willingness to aid him, but said he had "no money whatever at that time," and spoke of having made some land purchases, and having had $2,000.00 of security money to pay; however, that Mr. Oliver Beirne of Monroe county, West Virginia, was loaning money, and that if Hounshell could negotiate a loan from him, he, Hevener, would endorse Hounshell's paper; that Bierne replied to Hounsell's note, that he was loaning on short time, ninety days, and that Echols, of Staunton, Virginia, was his agent, attending to that kind of business for him, &c.; that the terms as to time being unsatisfactory to Hounshell, he wrote to Hevener, "informing him of the failure," as Hevener had requested him to do; and soon thereafter, October 20, 1873, Hevener wrote Hounshell, the following letter in reply:

"GREEN BANK, WEST VA., October 20, 1873.
"*Col. D. S. Hounshell:*

"DEAR SIR:—I received your last *male*. Am sorry you are about to *fail* in your loan, and I greatly fear nothing can be *don* by myself. Two thousand dollars of security money has *fell* to me to pay owing to this money *crises*, &c. This, together with my own bank debt, is *makeing* hard times with myself and *familly* and has greatly retarded my business, &c. Hope you still will succeed in making a loan or *arrangmts* by which you can save your house, and if you can do no better I hope you can sell it again. All are well. *Hop* you and family are likewise. Write soon. Your friend, &c."

"U. HEVENER."

Hounshell testifies that there is a mistake in the date of this letter, that it was 1872 and not 1873. Sometime afterwards he, Hounshell, received from Hevener the following letter, not in answer to any letter from Hounshell to him:

"GREEN BANK, WEST VA., Oct. 7, 1872.

" Col. Hounshell:

"DEAR SIR:—enclosed pleas find a letter from Mrs. Rogers In which She Speaks of your Trip to Greenbrier and of your Manner of Treatment towards her, and last of all Lets me no that I am responsible for the money She has paid for your house, &c. I Now advise you to Sell It If you can ; If you Can not Sell It then Se the man you purchased from, and If he does not need the money and will take me as Security, I will Endors the Bonds that are unpaid. I refer them to Wm. L. Jackson, of your State, or R. P. Camden, of West Va. Camden Is president of the National exchang Bank of Weston, West Va. If the money Is not needed, I no this Can Be don. Do your Best to Save It. I am of the opinion that Mrs. Rogers Is a hard Case, and It would Be well enough to Slap a suit on her In the U. S. States Cort at Charleston. If the will Could Be Set a Side, what do you think of this? You could do It, Being from another State. I am fully Satisfied that Mary never will get anything; but I think She could help Lue, If she would write me Soon on this Subject. All are well, and hope It finds you in good health, &c.

" Yours In hast,

"U. HEVENER."

Hounshell gave that letter to Berry, and he expressed himself satisfied. The note was accordingly forwarded to Hevener by mail, and soon thereafter Hounshell received a reply from Hevener, dated February 10, 1873, enclosing to him the note signed by Hevener. That letter is as follows:

"GREEN BANK, WEST VA., Febuary 10, 1873.

"D. S. Hounshell Esq.:

" DEAR SIR :—I received your Letter and Bond for $3,000.00 Endorsed By yourself and Lucy Hounsh. I also endorsed the Bond and here with enclose the same, and hope It will reach you safe, and I dare not Let Mary know that I have endorsed your Bond. She gives

1880
Special Term.

Hevener
v.
Berry et al.

me hail *When ever* I go *Security* for any one, *So* I wish you to *Say Nothing* and hope you can *Make* payment your *Self.* I *Lost* my *Suit In* U. States *Cort.* I think will take *It* to Supreme *Cort* of U. States. What do you think of *It* &c. ? *write* on receipt of this.

" Yours in *hast.*

" U. HEVENER."

Berry testified as follows :

" I never knew Mr. Hevener until long after the maturity of said note ; indeed never saw him until after judgment was obtained against him in my favor, of which I received notice from Mathews & Mathews, my attorneys in the said action, neither of whom I ever saw. Sometime in the latter part of 1872, as I now recollect, Col. D. S. Hounshell being largely indebted to me, I wanted him, said Hounshell, to make some arrangement to pay the same. Hounshell informed me that he had been in communication with a brother-in-law by the name of Uriah Henever, who was a man of fortune, and from whom he had assurances that he, the said Hevener, would furnish him money to pay off the entire claim, then about $5,250.00. He made a visit to said Hevener to see what he would do, as I now remember, but at any rate he, the said Hounshell, during the year 1872, presented me a letter from said Hevener directed to him, Hounshell, in which he, Hevener, said he could not then furnish the money, but would sign any obligation for said Hounshell and wife to pay the same one year after date, but finally agreed with Hounshell to sign the obligation for $3,000.00. I had nothing to do with it. Col. Hounshell afterwards, I think sometime in the spring of 1873, about February, 1873, presented me the note alluded to, signed by himself and wife, Lucy Hounshell, and by said Hevener. I afterwards had some correspondence with said Hevener, about one year thereafter, when said $3,000.00 obligation matured, but never had any before, and never saw said Hevener until after judgment was obtained in the Pocahontas circuit court, and my

attorneys informed me that Hevener would pay the same in a few days. Within a day or two thereafter, Mr. Hevener was introduced to me in Newport, by Col. Hounshell, told me he would like to make some arrangements for an extension of the said obligation."

Being asked when and upon what consideration he released the vendor's lien, he anwered:

"I think it was November 6, 1872, I released the lien, and the consideration was a mortgage upon said premises for a like amount, with interest, divided into two notes, one of $3,000.00, and the second for $2,360.00, bearing date November 6, 1872.

"Question—Is the $3,000.00 note mentioned in the mortgage from Hounshell and wife to you of November 6, 1872, the note, on which you have obtained judgment against the plaintiff in the circuit court of Pocahontas county, West Virginia?

"Answer—No, sir; Mr. Hevener's note had nothing to do with it whatever. I understood that he (Hevener) was to pay me said amount of $3,000.00 and look to said Hounshell for reimbursement; that said Hounshell's wife and said Hevener's wife were sisters, and expected in the future something from their mother-in-law's estate, but so far as Hevener's signing the note of $3,000.00 to me it was entirely a voluntary act of kindness to said Hounshell, and totally disconnected in any way with the transactions between Hounshell and myself for the purchase of the lot.

"Question—Then you state that the $3,000.00 for which Hevener's note was given was that amount Hounshell owed you over and above the purchase on the lot?

"Answer—No, sir; I do not so state. Col. Hounshell owed me the sum of about $5,360.00, but the note of Hevener and Hounshell and wife was delivered to me by Hounshell, in February, 1873, long after the transactions between Hounshell and myself.

"Question—In case Hevener was to pay the judgment you have against him, would Hounshell be entitled to

any credit on the purchase-money on the lot, or on either of the notes mentioned in the mortgage? If so, how much?

" Answer—No, sir; Col. Hounshell would not, nor his wife."

On the 28th day of March, 1877, interrogatories having been propounded to Berry he answered:

" I never told Uriah Hevener that I got the $3,000.00 note discounted by the Clay Insurance Company. I told him positively it was done by Col. Hounshell through Col. Smalley, attorney for the company, with whom Col. H. was very intimate, but the insurance company refused to take any but a first mortgage on the premises, to which I consented. This was an expedient of Col. Hounshell, resorted to because Uriah Hevener had failed to loan him some money as he had promised, Hevener assigning as a reason that he had been compelled to pay large security-debts at home with the money he had designed for Hounshell. I never had any talk with Hevener until after judgment against him in the Pocahontas circuit court, and that was in regard to giving him time for the payment of the judgment. Col. D. S. Hounshell got the exclusive benefit of the money. The loan was effected by Col. Hounshell through Col. Smalley, attorney for the company, and I knew nothing of it until Col. Hounshell informed me and requested me to give the company the first mortgage, as that was the only way he could get the money, showing me the letter, or reading to me part of a letter, I have forgotten which, from Hevener, in which he promised to give him a note of $3,000.00, payable in one year. The proceeds from the note discounted with the Clay Insurance Company belonged to Col. Hounshell, and he got it. I had no right to apply Col. Hounshell's money to any account, nor did I apply it. I regarded it as his money, not mine.

Col. Hounshell owed me other money beside that due on the house. The note of Hevener came to me really

as the consideration for releasing my lien and allowing Hounshell to give a first mortgage to the insurance company. Hounshell agreed that if I would allow his arrangement with the insurance company to be effected, he would give me the note of himself and wife, and of a rich brother-in-law in West Virginia, to wit, Mr. Hevener, who was willing to help him, and look to his honor and some expectancy of Mrs. Hounshell in her mother's estate for reimbursement. This was the idea in Hevener's letter, as I now remember, to Hounshell. Should I receive the amount of the judgment against Hevener, I will credit Hounshell with the same, and there will be a balance still due me from Hounshell.

"I knew from a letter or letters of Hevener to Col. Hounshell that Hevener proposed to loan Col. Hounshell money, and look to his ultimate success in his profession, and to certain means that Mrs. Hounshell expected from her mother's estate in Virginia for the payment thereof. Hevener never expected any security on the house for the money loaned. He told me when he came to Newport after the judgment against him in the Pocahontas circuit court, that his only object was to aid Col. Hounshell, who was his connection and warm personal friend; that he had always intended to pay it, and that all he wanted now was a little time, as he had been paying some security-debts at home; that he had confidence that Hounshell was an honorable man, and would repay him, but never once alluded to the idea that he claimed anything against the house and lot. He said when he sold certain fat cattle he then had on hand he would pay me every dollar. I never understood that he had any connection with the house and lot, or expected to be reimbursed from that source."

The following is what Hevener filed with his depositions as a copy of the letter written him by Hounshell, enclosing the note which Hevener signed, and upon which judgment was rendered:

"MY DEAR SIR: The above are copies of the four

original notes. I also enclose you a note I gave for the three first notes, taking them up. This note was discounted by the Clay Fire and Marine Insurance Company by my paying ten per cent. interest for the current year in advance of the maturity of the note. If you will help me to meet this $3,000.00 note, I can take care of the one thousand dollar note which Berry still holds. Be so good as to write me without delay on receipt of this letter. I thought when 1 wrote you from Greenbrier I told you all about my affairs. I recollect I did not write you why I did not live in the house I bought for $3,000.00 in 1869. It was this—the title was defective. The house I bought then I lived in for the period of about one month. My house is worth $6,000.00 and is a good bargain at that price. I mean the house bought ot Berry; and you will understand I own no other. This house I have had conveyed to Lue, as you are aware. I was compelled to give Mr. Berry some payments on these notes, and that explains why I enclose you the $3,000.00 note. I am more hopeful, as I gain practice with time. The children all have chicken-pox, and Lue has a fine son ; she calls him William Aubray Hounshell. Write me at your earliest convenience, and believe me ever your friend."

"D. S. HOUNSHELL."

The copies ot the four original notes, which were enclosed, were simply promissory notes, for $1,000.00 each, signed by Hounshell and wife, payable to Berry or order, dated, Newport, December 31, 1869, and due, respectively, one, two, three and four years after date. There is no date to the letter.

Thus summarizing the whole evidence in the case, we see, that whilst neither Hevener nor Berry is impeached, but both stand before us as truthful men, yet Berry has contradicted the testimony of Hevener in some points by his own testimony, as, tor instance, that he had told Hevener, that of the $3,000.00 obtained from the insurance company, he, Berry, had gotten $2,000.00, and

Hounshell $700.00. Berry says, "Col. D. S. Hounshell got the exclusive benefit of the money." The *allegata* of the bills having been directly by Berry denied, Hevener must prove his case, by plain, unmistakable and indisputable testimony, or show such circumstances as will indubitably connect Berry with the alleged fraud. I do not think the evidence does so. On the contrary, it shows a kind and good intention on the part of both, Hevener and Berry, to assist Hounshell and wife. Hounshell may have taken advantage of Hevener in procuring his name to the note; and Hevener may have supposed that he would be secure in the vendor's lien ; but he was not vigilant, he should not have presumed, that he was safely shielded by a supposed existence of a lien, but he should have, as a prudent business man, looked, before he gave his name and have seen whether such a lien existed or not. His own testimony shows, that he was indifferent as to that, and without solicitation from Berry he sent to Hounshell the letter, advising him to sell the house, and if he could not sell it, then he says, "see the man you purchased from, and if he does not need the money *and will take me as security, I will endorse the bonds that are unpaid. I refer them to William L. Jackson, of your State or R. P. Camden, of West Virginia. Camden is president of the National Exchange Bank of Weston, West Virginia. If the money is not needed, I know this can be done. Do your best to save it.*" This was October 7, 1872, and was the letter that Hounshell showed to Berry, when he urged Berry to release the vendor's lien, novate the purchase-money notes, and to take a mortgage on the property, and to permit Hounshell to negotiate the $3,000.00 note through the insurance company. That letter corroborated Hounshell's assertions to Berry, that if Berry would give the company the first mortgage to enable him to get the money, he, Hounshell, and wife would give Berry their note for $3,000.00 with Hevener as surety, whom he represented to be very rich. Hevener admits, that the whole transaction on his part,

as to giving the note, was brought about solely by Houn-shell, and not by Berry.

Now it may be true, that Hounshell took advantage of Hevener in the premises, but there is no evidence, that Berry was cognizant of it. Whilst on the other hand Hevener by his letter to Hounshell, it appears, enabled Hounshell to induce Berry to change his affair as vendor, by aggregating the principal and interest of the purchase-money, and releasing the vendor's lien, so that Hounshell could have the benefit of the new arrangement by borrowing from Berry the $3,000.00 note which was secured by the mortgage and endorsed by Berry, and by it negotiate a loan from the insurance company.

It is plain, that Berry at the earnest solicitation of Hounshell, who was thus backed by his brother-in-law, and who indicated by his letters so great a desire to help Hounshell, was induced to give Hounshell all the time that Hevener's letter asked for, and that too, three months before the note was signed by Hevener. He not only gave the time requested in consideration of the personal security, but he also assisted Hounshell in procuring the money he needed for present necessities. Hevener asked for one year. By the novation of the notes, one year's time was given, and Hounshell by the new arrangement was through the kindness of Berry assisted to the use of $3,000.00 more money by having the benefit of the mortgage note, and for which Berry, not Hevener, was liable by virtue of his endorsement to the company. Berry had thus surrendered $3,000.00 of the purchase-money to Hounshell for which he had not received one cent, and which he was liable to have to pay to the insurance company in consequence of his endorsement, if Hounshell did not meet it. But if Hounshell did meet it, then it would still leave him in debt to Berry $3,000.00, and interest from date of note, because the note thus negotiated with the insurance company was, in fact, the evidence of that much money due Berry from Hounshell and wife on the purchase of the

house and lot, but never paid to Berry. Taking that phase of the case as true, and the evidence certainly thus presents it, it is plain that Hevener's note was given by Hounshell to Berry as security for the $3,000.00, in consideration of which arrangement, as Berry testifies to, he released the vendor's lien and took from Hounshell and wife their individual notes, secured by mortgage, and gave to Hounshell the use of the mortgage $3,000.00 note.

It is plain that if Hounshell paid back to the insurance company the $3,000.00, and also paid to Berry the face of the note, that then Berry would have no right to claim from Hevener the payment of the note he signed, but that note under such circumstances should be surrendered up to Hevener cancelled, but *vice versa* if Hounshell paid the insurance company, and failed to pay Berry the mortgage-note he had the use of, until both the company and Berry were paid the mortgage-note by Hounshell, Hevener would be responsible under his note to Berry, and if under such a state of the affair, Hevener did have to pay Berry, and if upon payment thereof, Hevener would be entitled to substitution to the mortgage lien, that would be a matter between Hevener and Hounshell, but with which Berry would have nothing to do, and affords no grounds why Berry should be hindered in the collection of his debt, and the injunction continued in force.

I am therefore of opinion that the decree of the circuit court of Pocahontas county of May 3, 1877, should be reversed, the injunction dissolved and the original and amended bills dismissed at the costs of the appellee.


GREEN, PRESIDENT:

I agree with Brother Moore that the circuit court properly overruled the demurrers to the original and amended bills. When the original bill was filed the plaintiff did not know all the facts, and stated his case, there-

64

fore, but partially.   Still on the facts stated in the origin-
al bill he was clearly entitled to relief.   The first amend-
ed bill states all the facts as proven, and also certain oth-
er matters as facts which are not established by the
proof.  These additional statements not proven were given
a prominence by the plaintiff in his original and first
amended bill, which they did not have properly ; and
influenced by this the plaintiff did not make the Clay
Fire and Marine Insurance Company a party defendant
to the amended bill.   The circuit court, however, had
a much clearer view of the rights of the plaintiff on the
facts stated in the amended bill, than the counsel of the
plaintiff had ; and it properly directed the Clay Fire and
Marine Insurance Company to be made a defendant ;
and a second amended bill was filed making this com-
pany a defendant, and it filed its answer. The facts stated
in the first amended bill clearly entitled the plaintiff
to relief in equity.   The prayer of the amended bill
is, that the house and lot of Lucy Hounshell may be
sold to pay the unpaid purchase-money, for which the
plaintiff was security and for general relief.

The circuit court, as its final decree shows, did not
think that the plaintiff was entitled to the specific
relief prayed for, but that the plaintiff would have a
right to subject this house and lot to pay this purchase-
money, when he had first himself paid it, and not before.
Such relief is clearly not inconsistent with that prayed
for, and would properly be furnished under the prayer
for general relief; and the court therefore properly de-
clined to permit a third amended bill to be filed.   The
decree of the circuit court is based on no facts not stated
in the pleadings, though in rendering it the court obvi-
ously regarded as unimportant certain facts stated in the
bill and amended bill, which were not satisfactorily
proven.   The circuit court did not forget that "no facts
are properly in issue, unless charged in the bill, and of
course no proofs can generally be offered of facts not in
the bill, nor can relief be granted for matters not charged,

although they may be apparent from other facts, of pleading and evidence. For the court pronounces its decree *secundum allegata et probata.* Story's Eq. Plead. sec. 257 ; Cooper's Eq. Plead. pp. 5–7, sec. 28." The final decree rendered in this cause by the circuit court was based entirely on facts alleged in the pleadings, and on no other facts. In truth no other facts were attempted to be proven. The alleging of various other facts in the pleadings, which the court regarded as unimportant, if they were really so, would not vitiate its decree.

I concur also in the propositions of law laid down by Brother Moore in the beginning of his opinion, on which he bases the conclusions he reaches. They are in fact propositions of law properly deduced from my opinion in *Warren et al* v. *Branch et al.,* 15 W. Va. 21. But I differ with him as to the facts proven in this case and the application of this law to the facts proven. As I understand the facts proven these legal propositions have no application in this case.

What are the important facts proven in this case? They are as follows:

1st. The note for $3,000.00 dated November 6, 1872, signed by D. S. Hounshell, Lucy Hounshell and the plaintiff, Uriah Hevener, payable to Albert S. Berry or order one year after date and bearing ten per cent interest from maturity, the collection of which was enjoined in this suit, was signed by the plaintiff, Uriah Hevener, as collateral security for this amount of the unpaid purchase money due on the house and lot of his sister-in-law, Lucy Hounshell, in consideration that Albert S. Berry, the vendor, would give time on this amount of the purchase-money then due and not insist then on a sale of his sister-in-law's house to pay this unpaid purchase-money. The evidence beyond controversy establishes this fact. This fact is proved first by the deposition of Uriah Hevener. He says : "Hounshell told me he had several important cases, in which he was to get large fees; that they would be decided in twelve months,

*and he would then get the money to pay for this house, and I went on the note to give him further time."* It is obvious from this that he signed this note to get time on the payment of· the purchase-money of a house, which had been conveyed to his sister-in-law, and that he was induced to do so by her husband saying he could himself make the payment of this purchase-money in a year.

2d. This fact is proven by the correspondence between Hounshell and Hevener. What was probably the first letter which passed between these parties bears no date; but it was written by Hounshell to Hevener and enclosed a power of attorney to be signed by Hevener, authorizing Hounshell to endorse his, Hevener's, name on the notes executed by· Hounshell to Albert S. Berry, describing them and saying : " The same being for the purchase-money of the house said Hounshell purchased of said Berry in Newport, Campbell county, Kentucky, wherein said Hounshell now lives." This was the house, which had been conveyed to Mrs. Hounshell, the sister-in-law of Hevener. He did not sign this power of attorney. The next letter was written by Hevener to Hounshell, in which he says: " I now advise you to sell it (this house) if you can. If you cannot sell it, then see the man you purchased from, and if he does not need the money and will take me as security, I will endorse the bonds that are unpaid. If the money is not needed, I know this can be done. Do your best to save it." This letter clearly shows, that in this arrangement he was willing to become bound for this unpaid purchase-money, in order that he might save the house of his sister-in-law. This letter is dated October 7, 1872. The next letter is written by Hevener to Hounshell and is dated October 20, 1873, but is proved to be intended for October 20, 1872. In it he says: " I hope you will succeed in making a loan or arrangements, by which you can save your house, and if you can do no better, I hope you can sell it again." In this letter he also says: " I am sorry you are about to fail in your loan, and I greatly fear nothing

can be done by myself." The next letter was written by Hounshell to Hevener. It bears no date, but was written sometime between November 6, 1872, and February 10, 1873, when it was replied to. In this letter Hounshell enclosed the note for $3,000.00 to Hevener, which he signed, and which is copied above, it being the note, the collection of which is enjoined in this suit. It also enclosed a copy of a note signed by Hounshell and wife, dated November 6, 1872, payable one year after date to A. S. Berry or order, and bearing ten per cent. per annum interest after maturity. This note is an exact copy of the note, the collection of which is enjoined in this suit. It was given in lieu of three of the other notes, which had been given for the purchase-money of the house; and it was on this 6th of November, 1872, discounted by the Clay Fire and Marine Insurance Co. Who received the benefit of this discount is a disputed point betweeen the parties. This letter also enclosed copies of the original notes given for the purchase-money of this house which were taken up by this $3,000.00 note dated November 6, 1872, and which last note was discounted by the Clay Fire Insurance Co. The letter of Hounshell to Hevener enclosing these documents, says in explanation: "The above are copies of the four original notes. I enclose you a note, (he means a copy of a note) I gave for the three first notes, taking them up. This note was discounted by the Clay Fire and Marine Insurance Co., by my paying ten per cent. for the interest in advance of the maturity of the note. If you will help me to meet this $3,000.0J note I can take care of the $1,000.00 note Berry still holds." This letter shows clearly, that Hevener was asked to sign the note for $3,000.00, the collection of which was enjoined in this suit, to help Hounshell to pay a $3,000.00 note, which had been given for a part of the unpaid purchase-money of the house of Hevener's sister-in-law, and which note had been discounted by the Clay Fire and Marine Insurance Co. Of course Hevener could not have been

understood from this letter otherwise, than that this note had been discounted for the use of Berry. It was payable to him, he had, as Hevener was informed, been urging the payment of this $3,000.00 secured by this note, and of course when Hevener was informed it was discounted, he could not but infer it was done for the benefit of the owner of the note. He was of course induced to believe, that Berry had got the money he wanted, and what Hevener was asked to do was to sign a note for a like amount, payable in one year, and to help Hounshell to pay this note held by the Clay Mutual Fire and Marine Company, which was given for unpaid purchase-money due on his sister-in-law's house. He had promised to go security for this unpaid purchase-money in his letter of October 7, if time was given; and it having been given in this manner, it was proper for him to sign the $3,000.00 note. This he did, and enclosed it in a letter dated February 10, 1873, to Hounshell. In this letter he says: "I received your letter and bond for $3,000.00, endorsed by yourself and Lucy Hounshell. I also endorse the bond, and herewith enclose the same." This letter proves that Hevener signed this note of $3,000.00, to obtain one year's time on the payment of this unpaid purchase-money due on the house of his sister-in-law. This is all the correspondence between the parties; and it clearly shows that this was the sole object that induced Hevener to sign this note.

3d. This fact is also distinctly proven by Hounshell in his deposition. He says: "In the latter part of August, or early in September, 1872, I went to Mr. Hevener's residence in Pocahontas county, to ask a loan of money from him to make a payment to Mr. A. S. Berry upon my house in Newport, Ky. He expressed a willingness to aid me, but said he had no money whatever at that time." He then states an effort, that he made to borrow the money, which he wanted to make this payment on this house, of Mr. Bierne, of Monroe county, and his failure; and that having written Mr.

1880
Special Term.

Hevener
v.
Berry et al.

Hevener that he had failed, Hevener replied by the letter before referred to of October 20, 1872. The letter of October 7, 1872, he not only showed to Mr. Berry but left it in his possession. He says: "I herewith file a letter from Mr. Hevener bearing date October 7, 1872, which letter, I was under the impression, was still in Mr. Berry's possession. It must have been returned by Mr. Berry to me, as I have found it among my papers since filing the above exhibits; or there may have been another also written which I delivered to Mr. Berry." Probably there was not any other letter than those above referred to, as in another part of his deposition he says : "These with the letter Mr. Berry received from me contain all my correspondence, as I remember." If there was any other letter given by Hounshell to Berry written by Hevener, its contents were substantially the same as this letter of October 7, 1872, for Hounshell in his deposition says: "I received a letter from Mr. Hevener, in which he voluntarily offered to pay off my indebtedness to Berry, if the latter would wait one year, and expressed in that letter his willingness to sign any obligations to Berry. I gave this letter to Berry, and he expressed himself satisfied, and the note was accordingly forwarded to Mr. Hevener by mail." This letter, given to Berry Hounshell believes was probably the one dated October 7, 1872; but if not, it was another of similar import, which is not at all probable. It is therefore obvious that according to Hounshell's evidence this note was signed by Hevener in consideration of Berry's waiting a year for this much of the unpaid purchase-money on the house of his sister-in-law, and was given as collateral security for the note or notes representing this unpaid purchase-money.

Fourthly. This fact is finally proven by the answer of Berry himself to the original bill, sworn to. It is true, that he says that one of the objects of Hounshell in getting Hevener to sign this $3,000.00 note was to get him, Berry, to release the lien, which Berry had on

this house, for the unpaid purchase-money. But he does not pretend to say that this was any part of the consideration which induced Hevener to sign this note. He says in this answer: " D. S. Hounshell told him if he would release the lien retained in the deed for said property to secure the unpaid purchase money, he could and would with the help of Hevener pay him the sum of $3,000.00 upon said property ; and thereupon on the 6th of Novomber, 1872, he released the lien retained, as shown by the deed and endorsement thereon ; and a month or two after said Hounshell brought him the note for $3,000.00, signed by himself, wife and Uriah Hevener, which he accepted." This statement, as I will presently show, was not true, but in it there is a substantial admission that this $3,000.00 note, the collection of which was enjoined, was signed by Hevener as a part of the purchase-money due on the house of his sister-in-law, which is the fact, which I am now showing is fully proven.

2d. It is a fact satisfactorily established by the evidence in this case, that Albert S. Berry knew, that Hevener signed this $3,000.00 note to him in consideration of a year's time being extended on that much of the purchase-money on his sister-in-law's house then due. This is distinctly admitted by Berry himself. In his deposition he says : " Some time in the latter part of 1872, as I now recollect, Col. D. S. Hounshell being largely indebted to me, I wanted him, said Hounshell, to make some arrangement to pay the same. He informed me, that he had been in communication with a brother-in-law, Uriah Hevener, who was a man of fortune, and from whom he had assurances, that he, the said Hevener, would furnish him money to pay off the entire claim, then about $2,500.00. He made a visit to said Hevener to see what he would do, as I now remember, but at any rate he, the said Hounshell, during the year 1872 presented me a letter from said Hevener directed to him, Hounshell, in which he, Hevener, said he could

not then furnish the money, but would sign any obligation for said Hounshell and wife to pay the same one year after date, but finally agreed with Hounshell to sign the obligation for $3,000.00. I had nothing to do with it. Col. Hounshell afterwards some time in the spring of 1873, about February, 1873, presented me the note alluded to signed by himself and wife, Lucy Hounshell, and by said Hevener." The indebtedness alluded to in this deposition, the postponement of the enforcement of which for one year, it is admitted, was the consideration, which induced Hevener to sign this note of $3,000.00 as collateral security for that much of this indebtedness, was the balance of the unpaid purchase-money due on the house of Lucy Hounshell, the sister-in-law of Hevener. This is distinctly admitted in the answer of Berry to the amended bill. It is stated in this deposition to be about $5,250.00; its exact amount on November 6, 1872, as appears from the answer of Berry to this amended bill and the mortgage filed, was $5,360.00. The letter referred to in Berry's deposition as having been shown to him by Hounshell was doubtless Hevener's letter of October 7, 1872, which, Hounshell proves he not only showed to him but left with him. Berry's deposition shows, that he understood well its contents, and that Hevener was willing to give his note as collateral security for $3,000.00 of the unpaid purchase-money then due on the house of his sister-in-law, if he would not enforce the payment of the unpaid purchase-money for a year; that he agreed to this, and that this $3,000.00 note payable in one year was thereupon signed by Hevener as collateral security for this much of the unpaid purchase-money.

3d. It is a fact established beyond controversy by the evidence, that for the whole of this unpaid purchase-money on this house of Lucy Hounshell there was from the time the house was purchased, is now, and always has been a lien on this house. It is true, that Berry in his answer to the original bill does say, that on the 6th

65

of November, 1872, he released the lien on this house, which had been retained on the face of the deed for the whole of the unpaid purchase-money. But his answer to the amended bill, also sworn to and agreed to be received as his deposition, also shows, that this statement in his answer is not really true, but that it appeared to be only formally true by the suppression of facts afterwards discovered. His statement in his answer to the original bill, that he had released this lien on the 6th day of November, 1872, was substantially false and was made to appear to be true only by the suppression of facts well known to him. He well knew that the release he executed was merely formal. At the same time this release was executed, and as a part of the same transaction, a mortgage was executed to secure the whole of the unpaid purchase-money upon the same property, upon which the vendor's lien had been retained, as appears on the face of the mortgage. The form of this lien was changed; but the substance of it was continued.

4th. It is a fact, that on the 6th day of November, 1872, after the plaintiff, Hevener, had agreed to sign a note as collateral security for the unpaid purchase-money on this house of his sister-in-law, if time was given for its payment, Albert S. Berry, the vendor, and Lucy Hounshell, the vendee, and her husband, agreed to divide the whole of the unpaid purchase-money in this house into two payments, one of $3,000.00 to be paid in one year, and the other for $2,360.00 to be paid in eighteen months, and that the vendor's lien, which had been retained, should be released by Berry, and that Lucy S. Hounshell and her husband, D. S. Hounshell, should at the same time sign two notes payable to Berry for these two portions of the unpaid purchase-money and secure them by mortgage on this house, and also sign a third note corresponding precisely with the $3,000.00 note, a part of the purchase-money of this house, secured by this mortgage, and that this last note should be sent to the plaintiff, Hevener, for

his signature as collateral security for that portion of the purchase-money represented by the $3,000.00 note secured by the mortgage. And this mortgage and these three notes were all at the same time and as a part of the same transaction signed by Lucy S. Hounshell and D. S. Hounshell, and the release of the vendor's lien was at the same time and as a part of the same transaction signed by Berry. These facts abundantly appear by the face of the mortgage and by the three notes, all of these instruments being signed by D. S. Hounshell and Lucy S. Hounshell, his wife, and all bearing date at the same time, and the two notes of $3,000.00 each being identical in amount, date, party to whom payable and the day on which they were payable. The answer of Berry to the amended bill admits that the mortgage, the release of the vendor's-lien and the execution of the two notes secured by the mortgage were parts and parcels of the same transaction. And the other $3,000.00 note being dated the same day and there being no proof, when it was signed by Mounshell and wife, must of course be presumed to have been signed on that day by them. And it being payable to Berry and corresponding in all respects with one of the notes secured by the mortgage, it must be presumed to have been a part and parcel of the transaction, and when sent to the plaintiff, Hevener, afterwards by mail and signed by him, it must be regarded as executed by him as of the same time, the day it bears date. These facts make the inference inevitable, that all the parties regarded this note of $3,000.00, signed by Hevener as collateral security for the other $3,000.00 note. The letter of D. C. Hounshell to Hevener enclosing this $3,000.00 note for his signature proves beyond controversy, that this was their understanding. He says in this letter: "I also enclose you a note (meaning a copy of a note) I gave for the three first notes (of $1,000.00 each). If you will help me to meet this $3,000.00 note, I can take care of the $1,000.00 note Berry still holds." Clearly all par-

ties understood that this $3,000.00 note, which had been signed by Hounshell and wife, and which in this letter was sent to Hevener, was a collateral security for the $3,000.00 note corresponding precisely with it, a copy of which was enclosed, and which note was stated to be a part of the purchase-money of the house and was in fact secured by this mortgage, though this was not mentioned in the letter nor then known to Hevener.

These four facts, which are clearly established beyond controversy, are all the facts necessary to sustain the plaintiff's equity. If Berry had continued to be the holder of the $3,000.00 note secured by the mortgage on this house, there could be no question, but that, if the plaintiff, Hevener, paid him the corresponding $3,000.00 note, which was taken as collateral security for this note secured by this mortgage, he, the plaintiff, would have a right to be substituted to the benefit of this mortgage given by his principals. Can it in any manner vary his rights, that Berry with or without his knowledge assigned this $3,000.00 note secured by the mortgage on the day it bore date or at any other time to the Clay Fire and Marine Insurance Co., or that this company disclaim any interest in this $3,000.00 note signed by Hevener as collateral security and look only to the mortgage, the makers of the note and Berry, who endorsed it to the company? This $3,000.00 note signed by Hevener must still stand as collateral security to save Berry, if he shall be compelled to pay the $3,000.00 note secured by the mortgage. In case Berry did have it to pay, and Hevener had to pay his collateral note of $3,000.00 to Berry, of course Hevener would be substituted to the benefit of the mortgage given on this house to secure the primary note of $3,000.00. It is obvious, that these rights of the plaintiff, Hevener, could in no manner be affected by the fact, that when Berry assigned the primary note of $3,000.00 secured by the mortgage, the consideration was with his assent and direction paid to some third person or to D. S. Hounshell, one

of the drawers of this note, whether with or without the knowledge of Hevener. Nor would it make any difference in the rights of the plaintiff, Hevener, whether he knew or was ignorant, when he signed this collateral note, that his principals had given a vendor's lien or a mortgage to secure the primary note. He is entitled to be substituted, if he pays this collateral note, to all the securities, which his principals have given to secure the primary note, though he was ignorant, when he signed the collateral note, that any such security had been given, and though he had been entirely willing to sign the collateral note without the primary note being in any manner secured by his principals.

Much evidence has been taken in reference to these various questions; but they all seem to me entirely immaterial. The only important question is: " Was this $3,000.00 note signed by Hevener understood by the parties to the transaction as collateral security for a portion of the purchase-money due on this house ? I have reviewed the evidence on this point, and am satisfied that it was so understood by all parties, Hevener, Hounshell and Berry. I have shown, that this is not only abundantly proved by the evidence, but that it is substantially admitted by Berry in his deposition. It is true that finding, despite all the irrelevant testimony on other points stated in the bill and amended bill, that at last the case must turn on this point, whether the note signed by the plaintiff was or was not collateral security for a previous debt Berry, in his answer to the amended bill, which was also agreed to be considered as a deposition, expressly denies that the $3,000.00 note signed by Hevener was collateral security for an existing debt. This answer Bro. Moore considers as uncontradicted, and entitled to full credit, and on it his view of the case is based. We have shown that on this point this answer is abundantly contradicted by the other evidence.

Let us now consider. how much weight its state-

ments are entitled to, considered as though given in the deposition of Berry. I do not regard his statements on this point as entitled to the same weight as that of a disinterested witness given in a deposition. In the first place he is directly and deeply interested in the matter, concerning which he testifies; secondly, he has not been subjected to any cross-examination, but has prepared deliberately and carefully this statement as an answer; and lastly, there is much in the record to show, that his statements are worthy of but little credit, and should be adopted only after careful consideration. of their character, and only then, when probable, or at least consistent with the facts of the case. In his answer to the original bill sworn to by him, we have seen, he stated positively, that his lien on this house was released on November 6, 1872; but we have seen, that afterwards, when the real facts had become known to the plaintiff, he admits that this is substantially false, and that in truth the lien had never been released, but simply the form of it had been changed. He is a lawyer, and must have known, that this statement in his answer was calculated to deceive, as it doubtless was intended to.

In his answer to the amended bill he positively asserts, that when he assigned the $3,000.00, a part of the unpaid purchase-money secured by a mortgage on this house, he permitted Hounshell to receive from the assignee the whole amount of the consideration paid for this note by the assignee. This statement is under the circumstances appearing in this case improbable. If it were true, it must have been known to his partner, Hounshell, who received all this money, Berry says. But he, Hounshell, did not say one word on the subject, when his deposition was taken in behalf of Berry. Berry in his deposition admits that he wanted his unpaid purchase-money on this house paid, and called on Hounshell to make arrangements to pay it; and Hounshell was not prepared to pay it then and wanted time. When then the Clay Fire and Marine Insurance Co.

discounted this note for $3,000.00 given for a part of this unpaid purchase-money, on which a year's time had been given, it seems natural, that Berry would take the proceeds of this discount. He would then have gotten his money, which he wanted, and Hounshell the time he needed; and Berry would have been rendered entirely safe in the transaction by taking as collateral security for the risk he ran by endorsing this $3,000.00 note a like note for a like sum, payable at the same time, signed by Hevener, a perfectly responsible man.

Hevener in his deposition says: " Berry told him that he had gotten $2,000.00 out of $3,000.00 from the insurance company, that Hounshell had gotten $700.00, and that the insurance company had retained $300.00 for one year's interest." This seems more probable, than that Hounshell got the whole proceeds of this note of Berry's, as Berry now says. Again the statement of the occasion for Hevener's signing this $3,000.00, as stated in the answer of Berry to the amended bill, is, that Hounshell told him he was greatly in need of money and was anxious to effect a loan of $3,000.00; that he could get said sum upon loan from the Clay Fire and Marine Insurance Co., provided he could secure it by a first mortgage upon this house, and proposed that Berry should release his mortgage, and he would give him in its stead Uriah Hevener as personal security for this amount, and that he Berry consented to this arrangement.

The inference from this statement is, that Berry never heard of Hevener in this transaction, till this arrangment was about to be made, which was on November 6, 1872. But we know this is not true; for Berry in his deposition stated, that when he had urged Hounshell to pay this unpaid purchase-money, he went to West Virginia to see if he could get Hevener's assistance; and this visit, Hounshell says, was made in the latter part of August or early in September, 1872, more than two months before the time, when from the answer of Berry he would now have us to believe, he first heard of Hev-

ener in connection with this transaction.   We must. too infer from this transaction, as stated by Berry in his answer to the amended bill, that when he made this arrangement with the Clay Fire and Marine Insurance Company on November 6, 1872, he relied solely on the statements of Hounshell as to what Hevener would be willing to do.   This, we know, is not true.   In an answer to an interrogatory afterwards propounded to him, Berry says, that when this arrangement for this loan was being made, "Hounshell showed him, Berry, a letter, or read to him a part of a letter, he had forgotten which, from Hevener, in which he promised to give him a note of $3,000.00."   And again in answer to another interrogatory he says:   "Hounshell agreed, that if I would allow the arrangement with the insurance company to be effected, he would give me the note of himself and wife and of a rich brother-in-law in West Virginia, to wit, Mr. Hevener, who was willing to help him, and look to his honor and some expectancy of Mrs. Hounshell in her mother's estate for reimbursement.   This was the idea in Hevener's letter, as I now remember, to Hounshell."

While it is doubtless true, that a letter from Hevener to Hounshell was shown Berry, as Hounshell testifies to his having not only shown him a letter from Hevener but as having left the letter in Berry's possession, yet it is not probable, that it was not shown to him till November 6, 1872, as the letter is produced, and is dated October 7, 1872.   The contents of this letter too, which have been before stated by me, are entirely different from what they are represented by Berry.   No such ideas, as he says were in this letter, are to be found in it. Nor did Hevener ever write a letter to Hounshell containing any such ideas, for Hounshell testifies, that the letters he produces are all he ever got from Hevener on the subject.   It is not probable, that Hounshell imposed on his partner, Berry, as to what his brother-in-law, Hevener, was willing to do, especially when, we know,

he showed to Berry a letter from Hevener, which would have prevented him from succeeding in such imposition. It is more probable, that Berry and Hounshell, partners and astute lawyers, would impose on Hevener, an ignorant farmer.

Again if, as Berry says in his answer to the amended bill, he agreed with Hounshell to release his vendor's lien on this house, in order that Hounshell by giving a mortgage on it might borrow $3,000.00, and he did this in consideration of Hounshell promising in lieu of his vendor's lien to give Hevener as personal security for the $3,000.00 of the purchase-money of this house, how would such an arrangement be naturally carried out? Would it not be by the surrender by Berry of those of the notes of $1,000.00 each, given for a part of the unpaid purchase-money, and then by Hounshell drawing an ordinary note for the $3,000.00 he wanted to borrow and securing this note given for this money borrowed by a mortgage on this house? But this was not done. On the contrary the $3,000.00 actually secured by this mortgage, as the mortgage itself expressly says, was a note given for a part of the unpaid purchase-money of this house.

This statement in the mortgage itself in my judgment discredits the statements of Berry in his answer to the amended bill. It is impossible under such circumstances to place implicit faith in the statements contained in this answer. But we are under no necessity to determine how much truth there is in these statements. For if all the facts stated in this answer were true, they would of themselves prove, that this $3,000.00 note secured by Hevener was given as collateral security for the $3,000.00 note of same date and payable on the same day, given by Hounshell and wife to Berry, and by him assigned to the Clay Fire and Marine Insurance Company. This answer states, that the $3,000.00 note signed by Hounshell and wife and by Hevener was given for a part of the unpaid purchase-money of this house, and the note for

$3,000.00 given the same day and signed by Hounshell and wife and secured by a mortgage was also given for the same unpaid part of the purchase-money, as is expressly stated on the face of the mortgage.

There being then two notes given for this $3,000.00, one signed by the parties, who owed the debt, and the other by them and a stranger, both of these notes can not be primary debts. One of them must necessarily be collateral. Of course the note signed by the parties, who owed the debt, and secured by the mortgage must as a legal conclusion be regarded as the primary debt, and the other note as only a collateral security. The payment of either one of these $3,000.00 notes must necessarily destroy the other, so far as the payee or his assignee is concerned; for they were admittedly given for one and the same debt, a part of the unpaid purchase-money. The position of Berry's counsel, even if we admit his version of the case to be true, is illogical and cannot be sustained. This position is, that both the $3,000.00 notes may be legally collected of the makers by the payee or his assignee, though it is not denied, that they were given for one and the same debt.

For these reasons the decree of the circuit court of the 3d of May, 1877, must be affirmed; and the appellant must pay to the appellee his costs in this suit expended and $30.00 damages.

JUDGES HAYMOND AND JOHNSON CONCURRED WITH JUDGE GREEN.

DECREE AFFIRMED.